976 P.2d 624 (1999)
137 Wash.2d 904
STATE of Washington, Respondent,
v.
Johnny Lee RILEY, Jr., Petitioner.
No. 65845-4.
Supreme Court of Washington, En Banc.
Argued June 16, 1998.
Decided May 13, 1999.
*625 John S. Abolofia, Tacoma, for Petitioner.
*626 John Ladenburg, Pierce County Prosecutor, Kathleen Proctor, Deputy, Tacoma, for Respondent.
MADSEN, J.
Petitioner Johnny Lee Riley was convicted of first degree assault while armed with a deadly weapon. He maintains that the giving of an aggressor instruction violated his First Amendment rights. We affirm the conviction.

FACTS
On June 16, 1994, Johnny Lee Riley shot 15-year-old Gustavo Jaramillo. Riley claims he shot in self-defense. At the time of the shooting, Riley was 26 years old and was considerably larger than Jaramillo.
On the day of the shooting, Jaramillo was with his friend Aaron Calloway. Jaramillo and Calloway stole cars and sold drugs together, and on that day had used cocaine. Jaramillo also had a stolen car and a stolen 9 mm semiautomatic pistol in his possession.
Riley, who was visiting a friend, first saw Jaramillo in an alley, and asked about purchasing the car. Jaramillo and Calloway testified that Riley also wanted to buy the pistol. According to Riley, he left to tell his father about the car, but was unable to find him. He returned a short time later with another man. At the time, Jaramillo and Calloway were lying on a nearby lawn waiting for friends.
Conflicting testimony was given as to what occurred after Riley returned. Riley testified that he had asked Jaramillo about Jaramillo's gang, made some comments, and suggested that Jaramillo was only a "wanna-be." Verbatim Report of Proceedings (RP) at 28 (Nov. 10, 1994). He testified he did not intend any insult and instead said it jokingly. Jaramillo, though, was insulted, and said he was going to shoot Riley. Riley then pulled a gun on Jaramillo and demanded Jaramillo's gun so that Jaramillo would not shoot him in the back as he left. Jaramillo said he did not have a gun, that it was across the street in some bushes, which Riley did not believe. Riley also said that Jaramillo tried to distract him by claiming that the police were coming. Riley testified that Jaramillo was reaching for his gun when Riley shot him. Riley claimed he shot Jaramillo to keep him from shooting.
Other witnesses, including Calloway, testified that Riley approached, pulled out his gun and stood over Jaramillo while demanding to know where the 9 mm pistol was. Jaramillo's hands were by his head, as he had propped himself up on his right elbow, and the gun was in his right pants pocket, beneath him as he lay on his side on the ground. Riley ordered Jaramillo and Calloway not to move, and when Jaramillo looked up Riley shot him in the back of the neck, took Jaramillo's gun, and left.
Although conflicting evidence as to events was presented, there is no dispute that Riley pulled a gun on Jaramillo first.
Riley was charged with two counts of robbery, one count of assault in the first degree, and one count of unlawful possession of a firearm.
The issue at trial was whether Riley shot Jaramillo in self-defense, as he claimed. The trial court gave the jury several instructions on self-defense, and also gave an aggressor instruction. Clerk's Papers (CP) at 112 (Jury Instruction 15). Riley objected to the aggressor instruction, claiming that there was insufficient evidence to warrant giving it.
The jury found Riley guilty of assault in the first degree. Pursuant to the parties' agreement, the firearms charge was severed, and the trial judge found Riley guilty on that charge. The court sentenced Riley to a 300-month exceptional sentence.
Riley appealed, arguing that the giving of the aggressor instruction was error, that prosecutorial misconduct denied him a fair trial, and the trial court erred in imposing an exceptional sentence. Riley's convictions and sentence were affirmed in a Court of Appeals' Commissioner's ruling on the court's own motion on the merits. See RAP 18.14. Although Riley argued, among other things, that the giving of the aggressor instruction denied him First Amendment rights, the argument was not addressed because it was raised for the first time on appeal and the Commissioner ruled that Riley *627 had not shown a manifest error affecting a constitutional right. The Court of Appeals denied Riley's motion to modify the ruling.
Riley then sought discretionary review by this court, arguing only that the giving of the aggressor instruction was error.

ANALYSIS
The jury was instructed:
No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense and thereupon use, offer or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.
CP at 112 (Jury Instruction 15); see II Washington Pattern Jury Instructions; Criminal 16.04 (2d ed. 1994) (WPIC).
Riley maintains that the giving of the aggressor instruction in this case denied him the ability to argue his theory of self-defense and violated his First Amendment right to free speech. The argument in his petition for review, however, is confined to the First Amendment issue.[1] Apparently, Riley believes the aggressor instruction was based upon his comments about gang affiliation and calling Gustavo Jaramillo a "wanna-be." RP at 28. His premise is flawed because, although there was testimony to the contrary, there was evidence that Riley drew his gun first and aimed it at Jaramillo. The aggressor instruction in this case was proper because it was not based on Riley's words alone, but on his aggressive conduct as well.
"Jury instructions are sufficient if they permit each party to argue his theory of the case and properly inform the jury of the applicable law." State v. Bowerman, 115 Wash.2d 794, 809, 802 P.2d 116 (1990) (quoting State v. Rice, 110 Wash.2d 577, 603, 757 P.2d 889 (1988)). To raise self-defense before a jury, a defendant bears the initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense, i.e., the statutory elements of reasonable apprehension of great bodily harm and imminent danger. State v. Janes, 121 Wash.2d 220, 237, 850 P.2d 495, 22 A.L.R.5th 921 (1993). In order to establish self-defense, a finding of actual danger is not necessary. The jury instead must find only that the defendant reasonably believed that he or she was in danger of imminent harm. State v. LeFaber, 128 Wash.2d 896, 899, 913 P.2d 369 (1996). The evidence of self-defense must be assessed from the standpoint of the reasonably prudent person standing in the shoes of the defendant, knowing all the defendant knows and seeing all the defendant sees. Janes, 121 Wash.2d at 238, 850 P.2d 495.
However, in general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation, unless he or she in good faith first withdraws from the combat at a time and in a manner to let the other person know that he or she is withdrawing or intends to withdraw from further aggressive action. State v. Craig, 82 Wash.2d 777, 783, 514 P.2d 151 (1973). Where there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate. State v. Hughes, 106 Wash.2d 176, 191-92, 721 P.2d 902 (1986); State v. *628 Kidd, 57 Wash.App. 95, 100, 786 P.2d 847 (1990). If there is credible evidence that the defendant made the first move by drawing a weapon, the evidence supports the giving of an aggressor instruction. State v. Thompson, 47 Wash.App. 1, 7, 733 P.2d 584 (1987). An aggressor instruction is appropriate if there is conflicting evidence as to whether the defendant's conduct precipitated a fight. State v. Davis, 119 Wash.2d 657, 666, 835 P.2d 1039 (1992). The evidence supported giving the aggressor instruction in this case.[2]
Riley maintains, however, that the instruction violated his First Amendment rights. Before addressing this issue, we note that Riley's argument regarding his First Amendment claim fails to explain adequately his contention that he engaged in protected speech and fails to explain how the giving of the aggressor instruction ran afoul of the First Amendment. He fails to cite any authority which truly supports his argument that his First Amendment rights have been abridged. Instead, cases he relies upon involve defendants' claims of prosecution for speech. E.g., State v. Talley, 122 Wash.2d 192, 858 P.2d 217 (1993) (prosecution under "hate crimes" statute). As the Court of Appeals reasoned, Riley has failed to identify manifest error affecting a constitutional right which justifies his raising of the First Amendment claim for the first time on appeal. See RAP 2.5(a)(3). Nevertheless, we explain why Riley's argument otherwise fails under the facts in this case. See RAP 1.2(c).
Although language in some older cases suggest that words alone may justify the conclusion that the speaker is an aggressor,[3] we hold that words alone do not constitute sufficient provocation. Therefore, the giving of an aggressor instruction where words alone are the asserted provocation would be error completely aside from any First Amendment issue.
A "victim" faced with only words is not entitled to respond with force. As a leading treatise explains, the reason one generally cannot claim self-defense when one is an aggressor is because "the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense." 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.7, at 657-58 (1986) (footnotes omitted). If words alone, and in particular insulting words alone, could justify the "victim" in using force in response and preclude the speaker from self-defense, principles of self-defense *629 would be distorted. The right of self-defense would be rendered essentially meaningless because even if the "victim" responded with deadly force, the speaker could not lawfully defend with force and would instead be faced with the risk of suffering injury or a criminal conviction.
In addition, such a rule would effectively permit violence by a "victim" of mere words, contrary to the underpinnings of the initial aggressor doctrine. As noted, the initial aggressor doctrine is based upon the principle that the aggressor cannot claim self-defense because the victim of the aggressive act is entitled to respond with lawful force. For the victim's use of force to be lawful, the victim must reasonably believe he or she was in danger of imminent harm. However, mere words alone do not give rise to reasonable apprehension of great bodily harm.[4]
If applied in a case like this one, a rule that words alone preclude the speaker from claiming self-defense could lead to the conclusion that insults about gang affiliation justify a violent response.
Numerous courts have held either that one may not use force in self-defense from verbal assaults, or that an aggressor instruction is not justified where the alleged provocation is merely verbal. McDonald v. State, 764 P.2d 202, 205 (Okla.Crim.App.1988) (words alone do not transform the speaker into an aggressor); People v. Gordon, 223 A.D.2d 372, 373, 636 N.Y.S.2d 317 (1996) (jury properly instructed that concept of initial aggressor does not encompass mere insults as opposed to threats); State v. Bogie, 125 Vt. 414, 417, 217 A.2d 51 (1966) (court properly instructed that provocation by mere words will not justify a physical attack); State v. Schroeder, 199 Neb. 822, 826, 261 N.W.2d 759 (1978) (words alone are not sufficient justification for an assault; "[t]here is a very real danger in a rule which would legalize preventive assaults involving the use of deadly force where there has been nothing more than threat." Id. at 827, 261 N.W.2d 759); State v. Harris, 717 S.W.2d 233, 236 (Mo.Ct.App. 1986) (insulting or inflammatory language is not sufficient provocation to justify an assault against the speaker; language does not make the speaker an aggressor when he resists an assault made by the person addressed); Caudill v. Commonwealth, 27 Va. App. 81, 85, 497 S.E.2d 513 (1998) (words alone are never a sufficient provocation for one to seriously injure or kill another); State v. Blank, 352 N.W.2d 91, 92 (Minn.Ct.App. 1984) (provocative statements alone do not constitute a defense to assault); People v. Manzanares, 942 P.2d 1235, 1241 (Colo.Ct. App.1996) (that defendant may have uttered insults or participated in arguments does not justify first aggressor instruction) (citing People v. Beasley, 778 P.2d 304, 306 (Colo.Ct. App.1989) (insults alone do not make one the initial aggressor so as to preclude self-defense)); People v. Mayes, 262 Cal.App.2d 195, 197, 68 Cal.Rptr. 476 (1968) (no provocative act which does not amount to a threat or an attempt to inflict injury, and no conduct or words, no matter how offensive or exasperating, justify a battery). We agree with the conclusions of these courts.[5] Here, however, there was evidence of aggressive conduct on Riley's part, as noted.
Riley's argument also fails because the pattern instruction given in this case does not provide that words alone would be sufficient provocation to preclude a claim of self-defense. WPIC 16.04 states that "[n]o person may, by any intentional act reasonably *630 likely to provoke...." (Emphasis added.) The instruction does not refer to verbal provocation. Thus, the issue whether the victim is sufficiently provoked to use force, thereby denying the defendant the right to self-defense, does not turn on the protected or unprotected nature of defendant's speech, nor does the pattern jury instruction prohibit or penalize protected speech. It directs the jury to decide whether the defendant's act has precipitated a confrontation with the victim.
The Court of Appeals is affirmed.
GUY, C.J., and SMITH, JOHNSON, ALEXANDER and SANDERS, JJ., concur.
DURHAM, J. (concurring).
I agree that the "aggressor instruction," WPIC 16.04, was properly given in this case. Evidence in the record suggests that the instruction was appropriate based upon Riley's aggressive conduct. Accordingly, Riley's conviction should be affirmed. However, I write separately to note that the question of whether words alone are ever sufficient to justify the "aggressor instruction" is not before the court at this time. As Justice Talmadge points out, the majority in this case decides a point that is neither argued nor disputed by the parties. I think that it is unwise and unnecessary to decide this issue when it is not presented by the case before us.
TALMADGE, J. (concurring).
The trial court properly instructed the jury by giving the "aggressor instruction," WPIC 16.04, along with instructions on self-defense, because the jury had to decide between competing stories of who instigated the conflict, and because there is evidence supporting the view the defendant started the conflict. I write separately to take issue with the majority's assertion that words alone can never support the giving of an aggressor instruction.
Riley belatedly raises a First Amendment argument in this case suggesting an aggressor instruction may not be given where words alone are the provocation or, alternatively, may be given only in conjunction with an instruction on "fighting words" under the First Amendment. We have approved an aggressor instruction where the provocation was oral only. State v. Hawkins, 89 Wash. 449, 154 P. 827 (1916) (defendant was the aggressor and brought on affray by accusing deceased of castrating one of defendant's hogs).
I agree with the majority we do not need to reach Riley's First Amendment argument under the facts here. It is undisputed Riley pulled his gun first and aimed it at Jaramillo. There was evidence for the jury to rely on that Riley was not provoked into pulling his gun. Thus, this is not a case where words alone made Riley the possible aggressor. His act of drawing his weapon first, in addition to whatever alleged conversation he had with Jaramillo, constituted ample grounds for an aggressor instruction.
Nevertheless, the majority reaches beyond the necessities of this case to decide a point neither disputed nor argued by the parties: "Although language in some older cases suggest[s] that words alone may justify the conclusion that the speaker is an aggressor, we hold that words alone do not constitute sufficient provocation." Majority op. at ___ (footnote omitted). I cannot agree. The majority's concern, and cases the majority cites for support, involve the legality of an assault against the speaker of offensive or infuriating language. Although we have never had the opportunity to hold as much, it is likely we would agree with those courts that have held the recipient of invective or insult, in the absence of a palpable physical threat, is never privileged to respond with violence. We would most likely agree with Atticus Finch's advice to his precocious, six-year-old daughter, Scout: "[Y]ou just hold your head high and keep those fists down. No matter what anybody says to you, don't you let `em get your goat. Try fighting with your head for a change." Harper Lee, To Kill A Mockingbird 80 (1960). Modern society does not condone violent responses to mere language. As we said in State v. Mierz, 127 Wash.2d 460, 482, 901 P.2d 286, 50 A.L.R.5th 921 (1995): "It is a wise course, and the hallmark of our civilization, that the rule of *631 law should prevail over needless confrontation."
But this case is not about condoning a violent response to mere language. The question is not whether Jaramillo was justified in responding to Riley's taunts by going for his gun; Jaramillo was not on trial. This case is about Riley, the verbal aggressor and shooter. The hypothetical question the majority raises is whether Riley could have been deprived of a self-defense instruction solely because of the words he used to provoke Jaramillo. The question is hypothetical because Riley argued self-defense to the jury and actually received the benefit of self-defense instructions.
Nevertheless, the majority betrays its fundamental misunderstanding of the role of aggressor instructions by saying, "If words alone, and in particular insulting words alone, could justify the `victim' in using force in response and preclude the speaker from self-defense, principles of self-defense would be distorted." Majority op. at 628.[1] There is no attempt to justify or ratify the use of violence in response to provocative words. The focus is not on the conduct of the aggressor's victim, but on whether the State is deprived of an aggressor instruction when the aggressor claims self-defense after having provoked a fight with the victim. The majority conflates the two concepts, and a muddled analysis is the result.
The idea of a first aggressor may well be embedded in human nature as a manifestation of rudimentary justice. All can remember as children either using or hearing the excuse "But he started it" when being admonished by an adult for fighting. What "he started" may have been aggressive or provocative language as well as actual physical violence.
No one seriously disputes that "fighting words" exist, that there are "`words ... which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" City of Seattle v. Camby, 104 Wash.2d 49, 52, 701 P.2d 499 (1985) (quoting Chaplinsly v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). Recognizing the existence of "fighting words," however, is not the same thing as saying one is privileged to respond to "fighting words" with violence, despite the majority's misapprehension.
The majority, in fact, creates a privilege in a speaker to utter "fighting words" by asserting words alone can never result in an aggressor instruction for the speaker's provocative words. Thus, according to the majority, no matter what one says, no matter how provocative, no matter what the circumstance of the provocation, a speaker may always assert self-defense if attacked by the person the speaker provokes into attacking, and the State is never entitled to an aggressor instruction. The majority's rule defies human nature.
Imagine a funeral ceremony with hundreds of mourners for a widely respected African-American civil rights leader. A white supremacist appears at the church and begins shouting nonthreatening, racial epithets. Enraged mourners rush the person, who pulls out a concealed gun and kills several of them. At his trial for murder, he argues self-defense. Under the majority's reasoning, because he used only words to provoke the attack, the white supremacist was not an aggressor and the State is not entitled to an aggressor instruction. Imagine Friday night Sabbath services at Temple DeHirsch Sinai in Seattle. A man wearing full Nazi regalia appears and begins to deface the sanctuary walls with spray painted swastikas and anti-Semitic slogans in view of the congregated worshippers. His actions do not involve any threats of physical harm. Nevertheless, several of the congregants approach him and attempt to push him out the door. He responds by pushing back, and one of the congregants falls and is injured. At his trial for assault, the neo-Nazi argues he was only defending himself. Under the majority's reasoning, because he used only words or demonstrative speech to provoke the attack, he was not the aggressor and the State cannot obtain an aggressor instruction. Similar scenarios may be posited. In each such case, according to the majority, when only words are the provoking agents and there is no *632 threat of physical harm, the aggressor may always argue self-defense, but the State may never obtain an aggressor instruction.
The majority's reasoning is contrary to human nature and contrary to law. "Fighting words" by definition may provoke violence, and while all may agree such violence is never justified, very few besides the majority believe the aggressor ought always to be allowed to escape responsibility for the consequences of his or her provocative behavior by arguing self-defense. When one provokes another to violence by words alone, by a combination of words and threatening behavior, or by threatening behavior alone, Anglo-American law has always held the provacateur may lose the benefit of arguing self-defense[2] and the jury may be given the aggressor instruction. We should not create a rule of law to the contrary without the benefit of an actual case or controversy on the subject. I therefore concur only in the result.
DOLLIVER, J. Pro Tem., concurs.
NOTES
[1] Although Riley has devoted no argument in his petition for review to the issue, it is clear that he was able to argue his theory of the case. (Riley did not argue on appeal that insufficient evidence supported the aggressor instruction, as he had claimed at trial.) Each side is entitled to have the jury instructed on its theory of the case if there is evidence to support the theory. State v. Williams, 132 Wash.2d 248, 259-60, 937 P.2d 1052 (1997); State v. Hughes, 106 Wash.2d 176, 191, 721 P.2d 902 (1986). Failure to give such instructions is prejudicial error. Id. Riley was able to argue his theory of self-defense. Riley's counsel addressed self-defense in his opening statement and argued in closing argument that Riley acted in self-defense. The court's instructions thoroughly instructed the jury on self-defense in addition to giving the aggressor instruction. Conflicting evidence on the issue of self-defense was presented. Depending upon which evidence the jury found credible, it could accept or reject Riley's claim that he acted in self-defense.
[2] The Court of Appeals has commented that "[f]ew situations come to mind where the necessity for an aggressor instruction is warranted. The theories of the case can be sufficiently argued and understood by the jury without such instruction." State v. Arthur, 42 Wash.App. 120, 125 n. 1, 708 P.2d 1230 (1985). While an aggressor instruction should be given where called for by the evidence, an aggressor instruction impacts a defendant's claim of self-defense, which the State has the burden of disproving beyond a reasonable doubt. Accordingly, courts should use care in giving an aggressor instruction.
[3] In State v. McConaghy, 84 Wash. 168, 146 P. 396 (1915), for example, the court approved the giving of an aggressor instruction which stated that a person who "by acts or words provokes or brings on an affray," id. at 170, 146 P. 396, cannot claim self-defense. In State v. Currie, 74 Wash.2d 197, 199, 443 P.2d 808 (1968), the court relied upon McConaghy finding the language of the instruction at issue in McConaghy applicable. However, in McConaghy the defendant joined an altercation with a gun concealed under her apron, and there was evidence that she and the victim each used "violent and threatening" language and "overt acts ... towards the other indicating an intended assault." McConaghy, 84 Wash. at 170, 146 P. 396. In Currie, there was evidence that the defendant had a gun in his hand when he approached a truck driven by a Mr. Huston and immediately fired at the driver and the defendant's ex-wife, who was a passenger. Currie, 74 Wash.2d at 198, 443 P.2d 808. There was no evidence that the driver, if he even had a gun as the defendant testified, pointed it at the defendant or threatened him with it in any way. Thus, despite the language in the approved instruction, neither case involved words alone as provocation justifying an aggressor instruction. In State v. Hawkins, 89 Wash. 449, 154 P. 827 (1916), the defendant "dashed into the door" of a barn, "ran up" to a group of men in the barn, demanded to know what was the matter with them, accused the victim of cutting his hog and accused him of lying about it. Id. at 450, 154 P. 827 (quoting testimony). On the one hand, the defendant there did not strike the first blow and thus the case might be read to indicate that words are sufficient provocation to warrant an aggressor instruction. On the other hand, the defendant did approach the victim in a threatening manner.
[4] The court has held that reasonable apprehension of great bodily injury may be found based upon current circumstances in light of a pattern of abuse, State v. Janes, 121 Wash.2d 220, 850 P.2d 495, 22 A.L.R.5th 921 (1993), and that deadly force may be used in self-defense where a defendant reasonably believes he or she is threatened with death or great personal injury based upon subjective impressions of the facts and circumstances, including what is objectively an "ordinary battery," State v. Walden, 131 Wash.2d 469, 475, 932 P.2d 1237 (1997). Neither of these holdings is inconsistent with the principle that words alone should not provide the basis for an aggressor instruction.
[5] We are aware that some courts have said that mere words are sufficient provocation to justify an aggressor instruction. E.g., People v. Barnard, 208 Ill.App.3d 342, 350, 153 Ill.Dec. 345, 567 N.E.2d 60 (1991) (though there was evidence in the case that the defendant was the initial aggressor because he pointed a loaded pistol at the victim).
[1] The majority's use of quotes around the word victim indicates its evident skepticism that Jaramillo was the victim here. Jaramillo was the object of Riley's oral taunts and then the recipient of the shot Riley fired that rendered Jaramillo a quadriplegic.
[2] Contrary to the majority's implication, many cases from other jurisdictions support the proposition that an aggressor may lose the ability to argue self-defense by speaking provocative words. See, e.g., Vaughn v. State, 17 Ala.App. 383, 84 So. 879 (1920); Wheatley v. State, 93 Ark. 409, 125 S.W. 414 (1910); People v. Barnard, 208 Ill.App.3d 342, 153 Ill.Dec. 345, 567 N.E.2d 60 (mere words enough), appeal denied, 139 Ill.2d 598, 575 N.E.2d 917, 159 Ill.Dec. 110 (1991); McCarty v. Commonwealth, 244 Ky. 413, 51 S.W.2d 249 (1932); State v. Ball, 262 S.W. 1043 (Mo.1924); State v. Council, 129 S.C. 116, 123 S.E. 788 (1924); Smith v. State, 965 S.W.2d 509 (Tex.Crim.App.1998); Scott v. Commonwealth, 143 Va. 510, 129 S.E. 360 (1925).