IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32997-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER D. THORSON, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Christopher Thorson appeals his first degree murder

conviction. He argues that the trial court erred in refusing to give his proposed

diminished capacity instruction. Because the trial court gave a voluntary intoxication

instruction which allowed Mr. Thorson to argue his theory of the case, we affirm.

FACTS

On April 12, 2012, after a week of heavy drinking, Christopher Thorson shot and

killed his wife, Vanessa Thorson, in their home. After the shooting, Mr. Thorson called

911 to report that he had just shot his wife and that he would be waiting on his back porch

for police to arrive. During a police interview, Mr. Thorson explained that his 37-year

marriage had been collapsing due to multiple stresses and that he and Ms. Thorson had

been arguing and drinking heavily before the shooting. An autopsy revealed that Ms. Thorson's blood alcohol level at death was 0.45. Mr. Thorson's blood alcohol level was estimated to be about 0.234 at the time of the shooting.

Mr. Thorson had difficulty remembering details of the shooting. For example, he could remember shooting his wife while she was on the living room couch, but he could not recall whether she was awake or asleep. When the detective asked Mr. Thorson what he was thinking when he shot Ms. Thorson, he responded: "I don't personally think that I ever made a decision because if I was rationally thinking I would never have done that. But we may have sat and had an argument but would I have done anything to hurt her, hell i[n] thirty seven years I never raised my hand to that woman." Ex. 11 at 48.

The State charged Mr. Thorson with premeditated first degree murder with a firearm enhancement and alleged as aggravating factors that (1) Mr. Thorson knew or should have known the victim was particularly vulnerable, and (2) Mr. Thorson manifested deliberate cruelty to the victim.

Detective Jeffrey Rhoades interviewed Mr. Thorson shortly after the shooting and testified at trial that "[i]t was apparent that [Mr. Thorson] was under the influence of alcohol. I noted the odor of intoxicants on him as he spoke. He advised that he had been drinking. However he was able to maintain communication with me for approximately, I

2

believe the hour and 33 minutes I think is the total time on the recording. There was [sic] times he would go off on other subjects, but he was always able to come back to the subject we were talking about." Report of Proceedings (RP) at 233.

At trial, Stephen Manley Juergens, MD, a psychiatrist with a specialty in addiction psychiatry from the American Board of Psychiatry and Neurology, testified for the defense. He reviewed police reports and the blood alcohol test, interviewed Mr. Thorson's family members, and listened to the recording of the 911 call, and Mr. Thorson's interview with Detective Rhoades. According to Dr. Juergens, the Thorsons had been heavy drinkers for many years and had engaged in binge drinking in the last several years, which he described as excessive drinking "for periods of hours to days." RP at 276. He explained, "[i]t's not like four or five drinks every night, but that you start to drink and lose control and drink heavily in—the evening, or over an extended period of days." RP at 276. He noted that Mr. Thorson's history of alcohol-related problems began when he was a teenager and included alcohol-related driving problems, personality changes, significant marital problems, blackouts, and missed work.

Dr. Juergens testified that on April 3 or April 4, after an exhausting and unwelcome move to accommodate Mr. Thorson's work, the Thorsons started a drinking binge that culminated in the shooting on April 12. Dr. Juergens noted that Mr. Thorson

3

sounded very distraught on the 911 recording after the shooting, but conceded that it was difficult to ascertain the level of intoxication from the recording. Dr. Juergens explained that although Mr. Thorson was able to converse with the 911 dispatcher and follow directions, such moments of clarity are not inconsistent with significant intoxication. Dr. Juergens noted that despite Mr. Thorson's moments of apparent lucidity after the shooting, Mr. Thorson's high blood alcohol level, rambling conversation and inappropriate jokes with detectives, and inability to recall much detail about the 14-hour period prior to the 911 call were evidence that he was significantly intoxicated. Dr. Juergens pointed out that although Mr. Thorson recalled shooting his wife and that they had been arguing, he could not remember what had happened in the 10 to 15 seconds around the shooting.

Dr. Juergens further explained that for eight or nine days before the shooting, Mr. Thorson was in a blackout, which he described as "act[ing] like you know what's going on. You may be intoxicated, slurring your words, or you might be clear, you're making a decision. It may not be a very good decision. It may be a horrible decision because you're intoxicated. But you're—you're going ahead with it." RP at 292. According to Dr. Juergens, a person in a blackout is unable to hold a short-term memory for more than 5 to 20 minutes. He explained that someone in a blackout would be able to describe what

4

they did a minute ago, but that 30 minutes later, they may not remember because memory becomes impaired. He further explained that a blackout is associated with alcohol dependence and is a good indication of the level of intoxication.

Extrapolating from Mr. Thorson's blood alcohol level six hours after the murder, Dr. Juergens estimated that Mr. Thorson's blood alcohol level was approximately .234 when the shooting occurred. Dr. Juergens opined that Mr. Thorson was suffering from an "alcohol induced delirium" on the day of the murder. RP at 301, 305. He testified that this condition is a mental disorder recognized by the American Psychiatric Association and is characterized by confusion, lack of awareness, inability to focus, emotional lability, and variable mood states from hyper-alert to paranoia. He explained that such a delirium is "an indication of significant affect on the brain from various insults" that can last for hours to days, and that even as the alcohol leaves the system, the confusion can remain for hours to a day. RP at 305.

Dr. Juergens ultimately concluded that the alcohol-induced delirium impaired Mr. Thorson's ability to premeditate or form the intent for murder when he fired the weapon at his wife. Dr. Juergens maintained that Mr. Thorson "made a very quick and confused decision in the context of alcohol intoxication and with its effect on clouding judgment causing dis-inhibition and confusion leading to bizarre acts and inexplicable behaviors."

5

RP at 309. During cross-examination, he agreed that it was a "voluntary intoxication." RP at 313.

The State's expert, Judith Lynn Kirkeby, a forensic psychologist with a PhD in clinical psychology, disagreed with Dr. Juergens. In her opinion, the fact that Mr. Thorson was in a blackout during the shooting did not impair his capacity to form intent at the time of the offense. She stated, "[a blackout] doesn't mean that during the incident, which later the person cannot recall—doesn't mean their memory at that time was impaired." RP at 500. After reviewing the police reports, interviewing Mr. Thorson, and listening to recordings of the 911 call and the police interview, she concluded that Mr. Thorson, although intoxicated, had not been in a state of delirium when he shot Ms. Thorson.

Mr. Thorson proposed both a diminished capacity instruction and a voluntary intoxication instruction. The proposed diminished capacity instruction read: "Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form premeditation and/or intent." CP at 82. The proposed voluntary intoxication instruction stated: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted with

6

premeditation and/or intent." CP at 83.

Defense counsel argued that diminished capacity due to a mental disorder is distinguishable from an intoxication defense because "in the one case, intoxication may be considered in determining whether . . . it had an impact on a mental element, whereas diminished capacity presents to the jury evidence that because of the mental condition which may or may not be [related to] intoxication, [the defendant] could have had the capacity to even form that mental element, not that it just had an impact on it." RP at 632-33.

The State countered that a voluntary intoxication instruction was sufficient because there was no evidence that anything impacted Mr. Thorson's mental capacity other than his alcohol intoxication. It argued, "[t]here has been sufficient evidence presented certainly to instruct upon the voluntary intoxication. But no evidence whatever to suggest duplicating that with an additional instruction of diminished capacity based upon a mental illness or disorder when there's been no evidence of any mental illness of disorder, other than that of intoxication." RP at 628. The State argued "although there may be a clinical distinction between intoxication and intoxication delirium, and what the difference is with respect to what they mean for the defendant's ability to form the mental state, the jury has that evidence. They have opinions from both sides." RP at 638.

7

Defense counsel responded,

> It's not the intoxication, it's the delirium. And delirium also is a separate disorder. The fact that it's alcohol induced doesn't mean that it's now the intoxication defense. That's not what it says. And [Dr. Juergens] specifically indicated that based on this induced delirium, that's what deprived the defendant of the ability to form the capacity for premeditation.

RP at 629.

The court declined to give the diminished capacity instruction, finding that the voluntary intoxication instruction, instruction 7, allowed the defense to argue their theory of the case. A jury subsequently found Mr. Thorson guilty of first degree murder while armed with a firearm. It did not find the presence of the alleged aggravating factors.

## ANALYSIS

Mr. Thorson argues that it was reversible error for the trial court to refuse to give his proposed diminished capacity instruction. The crux of his argument is that a diminished capacity instruction brings attention to whether the delirium—not just the alcohol—prevented him from intending the offense. He argues, "diminished capacity is the result of a mental condition (delirium) that impaired [Mr.] Thorson from developing the requisite mental state (premeditation/ intent) required to commit the charged offense. Voluntary intoxication, on the other hand, is not a defense, as such, but merely a factor that a jury may consider in determining if a defendant acted with the specific mental

8

intent required for the crime charged." Br. of Appellant at 8-9. The State responds that the voluntary intoxication instruction allowed Mr. Thorson to argue his defense and therefore the court did not err in refusing to give the diminished capacity instruction.

Jury instructions must allow the parties to argue their case theories and properly inform the jury of the applicable law. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). Each party may instruct the jury on its case theory as long as evidence exists to support that theory. *State v. Williams*, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997). Failure to instruct on a defense theory when evidence supports it constitutes reversible error. *Id.* at 260.

A trial court should instruct a jury on a diminished capacity defense when the defendant produces expert testimony of a mental condition that "logically and reasonably connects the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged." *State v. Griffin*, 100 Wn.2d 417, 419, 670 P.2d 265 (1983). A defendant must show three elements when asserting a diminished capacity defense: (1) the crime charged must include a particular mental state as an element, (2) the defendant must present evidence of a mental disorder, and (3) expert testimony must logically and reasonably connect the defendant's alleged mental condition with the asserted inability or form the mental state required for the charged

crime. *State v. Atesbeha*, 142 Wn.2d 904, 914-15, 16 P.3d 626 (2001).

The Washington State Supreme Court explained the distinction between

diminished capacity and voluntary intoxication in *State v. Furman*:

> Appellant offered two substantially overlapping defenses–diminished capacity and voluntary intoxication. Diminished capacity is a mental condition not amounting to insanity which prevents the defendant from possessing the requisite mental state necessary to commit the crime charged. If there is substantial evidence to support either of these theories, the jury should be given instructions which allow the defendant to argue the defense. *If the claim of diminished capacity is premised wholly or partly on the defendant's voluntary consumption of drugs or alcohol, however, one instruction can be adequate to permit the defendant to argue defendant's theory of the case.* State v. Hansen, 46 Wn. App. 292, 730 P.2d 706, 737 P.2d 670 (1987). In *Hansen*, the Court of Appeals held that an instruction on voluntary intoxication was adequate to allow the defendant to argue the claim of diminished capacity based on drug intoxication. In much the same manner, the diminished capacity instruction which appellant's jury received was adequate to permit him to argue that drug use and other factors made him unable to premeditate the murder. The trial court's failure to give a separate instruction on voluntary intoxication did not impair the appellant's ability to argue his theory of the case.

*State v. Furman*, 122 Wn.2d 440, 454, 858 P.2d 1092 (1993) (emphasis added).

Like the appellant in *Hansen*, Mr. Thorson was able to argue his case theory. He

made his theory known to the jury throughout the trial and argued it in his closing

argument. During closing argument, defense counsel argued that Mr. Thorson lacked the

capacity to premeditate murder based on his high level of intoxication, which induced a

state of delirium. The jury heard testimony about Mr. Thorson's days of binge drinking

before the shooting and high level of intoxication at the time of the offense. Dr. Juergens provided extensive expert testimony about alcohol-induced delirium and told the jury that Mr. Thorson's high level of intoxication rendered him confused, disinhibited, and unable to form the intent to shoot his wife. In the end, there was unrefuted evidence that Mr. Thorson was intoxicated, and counsel was able to argue that this intoxication created a mental state that affected Mr. Thorson's ability to form the requisite intent for first degree murder. Thus, the trial court did not err by refusing to give the additional diminished capacity instruction.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

In his SAG, Mr. Thorson raises two additional issues. First, he contends that the prosecutor and defense attorney "were working deals before the start of trial to shorten it to meet their personal schedules" and were agreeing on issues in order to shorten the State's case and "lighten [the] economic burden on the court." SAG at 1. In his second additional ground, he alleges that defense counsel failed to look out for Mr. Thorson's "best interest" by placing everything on a "'fast track'" and failing to object to the "lying" witnesses. SAG at 1.

In support of his first additional ground, Mr. Thorson points to several pages in the record where the alleged deals occurred. However, we find no evidence in the cited

11

pages of any such deals. But even if these deals existed, Mr. Thorson fails to explain how they prejudiced his case. His failure to provide supporting argument compromises our ability to review the issue. Mr. Thorson's second argument suffers from the same deficiency. While a defendant is not required to cite to the record or authority to support issues raised in his SAG, he must still "inform the court of the nature and occurrence of [the] alleged errors." RAP 10.10(c). Here, Mr. Thorson fails to adequately describe the nature of any alleged errors as required by RAP 10.10(c). Accordingly, we are unable to address his claims.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Korsmo, J.                             Fearing, J.

12