# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48093-0-II |
| Respondent, | (Cons. w/ Nos. 48096-4-II & 48103-1-II) |
| v. | |
| D. J. M., | UNPUBLISHED OPINION |
| Appellant. | |

| | |
|---|---|
| STATE OF WASHINGTON, | |
| Respondent, | 48096-4-II |
| v. | |
| L. D. M., | UNPUBLISHED OPINION |
| Appellants | |

No. 48093-0-II
(Cons. w/ Nos. 48096-4-II
  and 48103-1-II)

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48103-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| L. K. M., | |
| Appellant. | |

SUTTON, J. — Three siblings, DJM,[1] LDM, and LKM were adjudicated guilty of second degree assault after a fight at their high school with another student, CH.[2] DJM, LKM, and LDM appeal, arguing that (1) they did not validly waive the conflict of interest resulting from joint representation, (2) the juvenile court misapplied the doctrines of self-defense and the defense of others, (3) they were constitutionally entitled to a jury trial, and (4) the juvenile court improperly imposed additional terms of disposition including no-contact orders. We affirm the juvenile adjudications but remand to the juvenile court to strike the additional conditions of disposition.[3]

---

[1] Per ruling of April 25, 2016, we refer to the appellants by their initials.

[2] We use initials for the victim and the witnesses to provide anonymity.

[3] The appellants also ask us to exercise our discretion and not impose appellate costs. Under RAP 14.2, a commissioner or clerk of this court has the ability to determine whether appellate costs should be imposed based on the appellants' ability to pay and prior determinations regarding indigency. If the State decides to pursue costs for this appeal, a commissioner will make a determination as to whether costs should be imposed.

FACTS

On February 23, 2015, DJM and her brothers, LKM and LDM, arrived at Washington High School. All three siblings entered the school cafeteria to have breakfast before school started. CH was already in the cafeteria sitting at a table eating breakfast with his friends, DH and JB. DJM walked up to CH and punched him several times, knocking CH out of his chair and onto the floor. As CH got up and walked around the other end of the table, LKM joined his sister. Then, LDM joined his siblings. At the same time, the school security officer, Jim Wiedow, attempted to intervene by putting himself between CH and DJM, LKM, and LDM. However, LKM and LDM continued trying to get past Wiedow in order to get to CH.

As the fight between LKM, DJM, and CH escalated, LDM engaged in a second, separate fight with CH's friend, DH, to prevent DH from intervening in the fight. Wiedow continued his efforts to separate DJM and LKM from CH. After a few minutes, Wiedow was able to successfully intervene and stop the fight. After the fight, CH had a swollen lip and several broken teeth.

The next day the State charged DJM, LKM, and LDM with second degree assault.

I. JOINT REPRESENTATION

Before trial, the juvenile court heard a motion to waive conflict of interest and consent to joint representation for all three siblings. The juvenile court expressed concern about the joint representation:

> [A]ssuming that each one of the. . . respondents wishes to go forward with joint representation, I need that confirmation on the record from each one of you. And again, I will tell you that it would not be my choice to have you go forward with the same counsel because where it's one event, which in this case it's one event, and-help me here, what is the exact charge?

3

. . . .

Assault in the second degree is a very, very serious crime, it's a strike offense. And where there is an assault that takes place allegedly with the participation of three individuals; there is, I believe, a huge potential for there being conflict as between the respondents because one might see it slightly differently than another, and one might say I didn't do it but I saw this. And that's where the conflict comes in. So I want to be very clear with each one of you that you understand that potential conflict and you're waiving the conflict and you wish to go forward with joint representation.

Verbatim Report of Proceedings (VRP) at 6. However, all the siblings told the juvenile court that they wanted to be represented by the same attorney, that they waived any conflict of interest, and that they consented to joint representation. The juvenile court agreed to allow the joint representation. Each of the siblings also entered written waivers of the conflict of interest.

On the day of trial, the juvenile court confirmed that the siblings waived the potential conflict of interest and wanted to proceed with joint representation at trial:

[COURT]: DJM, you are aware that potential conflicts could arise with respect to yourself and the other respondents in this case. Is it still your desire to waive any conflict and proceed with one attorney?

[DEFENSE ATTORNEY]: Do you understand?

[DJM]: No, I don't.

[DEFENSE ATTORNEY]: This is the same—this is the same issue we had the briefing about before.

. . . .

[DEFENSE ATTORNEY]: Your Honor, may I have the Court's permission to sort of translate?

[COURT]: Yes.

. . . .

[COURT]: . . . . So having now had a chance to discuss the matter once again with your attorney, and it is the same motion that Judge Serko previously ruled upon, is it your wish, DJM, to waive any potential conflict of interest with the

4

other two respondents and proceed to trial with all three of you using the same lawyer?

[DJM]:  Yes, Your Honor.

[COURT]:  And LKM?

[LKM]:  Yes, Your Honor.

. . . .

[COURT]:  Do you have the same answer as DJM, that you wish to waive any potential conflict and use the same lawyer?

[LKM]:  Yes, Your Honor.

[COURT]:  And LDM, do you wish to waive any actual or potential conflict of interest and use the same lawyer?

[LDM]:  Yes, Your Honor.

VRP at 9-11.

## II. TRIAL TESTIMONY

CH testified at trial.  CH was generally obtrusive and unforthcoming.  CH stated on multiple occasions that he did not want to talk about the events on February 23 and refused to answer the State's questions.  However, CH did testify that the pictures of his broken teeth and swollen lip accurately represented his condition after the fight.  And CH testified that neither his teeth nor his lip were in that condition that morning when he arrived at school.

Rebecca Patterson is a paraeducator who was assigned to monitor breakfast in the cafeteria on February 23.  Patterson testified that she saw DJM walk up to CH, punch him, and knock him down.  CH got up and started to walk away from DJM.  While the fight was going on, Patterson noticed a second fight going on in the cafeteria.  She attempted to keep other students from getting involved in that fight or starting any additional fights.

Wiedow testified that he was also monitoring the cafeteria the morning of February 23. He had been talking to Patterson when he saw DJM walk up to CH, hit him on the head, and knock CH out of his chair and onto the ground. Wiedow saw CH walk around the other end of the table and move toward the cafeteria exit. Wiedow attempted to shield CH in order to prevent any further conflict. However, Wiedow testified that LKM and LDM were attempting to push past him to reach CH. While Wiedow was attempting to shield CH from LKM, DJM continued to assault CH.

The State introduced several different videos showing the fight. The first video is from the school's surveillance camera and shows both fights. Wiedow reviewed the surveillance video and explained what was happening in the video. The surveillance video is consistent with Wiedow's trial testimony. The State also introduced a surveillance video showing DJM immediately after the fight. In the video, DJM is jumping around and laughing with friends. The State also introduced two cell phone videos of the fight. The first video shows DJM walk up to CH while he is eating breakfast. It also shows DJM hit CH and knock him out of his chair. The second cell phone video shows CH walk around the end of the table where he is confronted by DJM, LKM, and LDM. The video also shows Wiedow attempting to intervene and stop the fight.

DJM, LKM, and LDM testified at trial. DJM testified that CH had been harassing her both verbally and on Facebook. And she testified that on the morning of February 23, CH made a face "like a smirk" at her. VRP at 289. When CH smirked at DJM, she "just got angry." VRP at 296. DJM stated that after she hit CH and knocked him out of the chair, she just stood there waiting to see what would happen. LKM testified that he saw DJM hit CH and then he moved in front of DJM in order to protect her. LDM testified that he was getting his breakfast when he saw DJM

6

start fighting CH, and then he saw CH fall out of his chair. When LDM saw DJM and LKM engage in the continued confrontation with CH, he intervened by confronting CH's friend, DH, in order to prevent DH from aiding CH.

### III. JUVENILE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

After the trial, the juvenile court entered findings of fact and conclusions of law. The juvenile court found Wiedow's and Patterson's testimony credible. The juvenile court also found that, when CH got up from getting knocked out of the chair, he walked around the table in order to move toward the exit. The juvenile court concluded that both DJM and LKM were aggressors in the fight and neither one of them could claim self-defense.

The juvenile court also found that CH did not respond to DJM's initial assault and instead moved away from her. And when Wiedow attempted to intervene and keep the parties separated, DJM, LKM, and LDM ignored him and continued to pursue CH. The juvenile court also found that CH was not an aggressor in the fight and thus, he was entitled to use self-defense.

The juvenile court found that LDM engaged in a fight with DH specifically to prevent DH from interfering in DJM's and LKM's assault on CH. And the juvenile court found that LDM could not reasonably have believed that his siblings were innocent aggressors in the fight.[4] Therefore, defense of others was not available to LDM as a defense.

Based on its findings of fact, the juvenile court concluded that DJM, LKM, and LDM were guilty beyond a reasonable doubt of second degree assault.

## IV. SENTENCING AND DISPOSITION

At sentencing, the State argued that DJM, LDM, and LKM should receive standard range sentences. DJM, LDM, and LKM requested that they be granted a manifest injustice sentence below the standard range. Each sibling presented a mental health evaluation that demonstrated each had mental health issues, such as anxiety and depression, which contributed to the assault on CH. Each also presented a comprehensive plan of mental health treatment and mentorship that would treat their mental health issues and help them build skills to deal effectively with problems and confrontations.

The juvenile court found that DJM, LKM, and LDM did not meet the criteria for a manifest injustice sentence below the standard range. The juvenile court imposed a standard range sentence of 15-36 weeks confinement for each sibling. The juvenile court also ordered additional conditions of disposition as to each, including prohibiting contact with CH.

---

[4] The trial court's findings of fact regarding the availability of defense of others for LDM were entered after we remanded to the trial court to make supplemental findings of fact.

8

DJM, LKM, and LDM appeal.  In the interests of justice, we consider all arguments as if they had been adopted by each co-appellant.  RAP 1.2.

ANALYSIS

I. JOINT REPRESENTATION

DJM argues that she did not execute a valid, fully informed waiver of the potential conflict of interest created by the joint representation.  Criminal defendants have a Sixth Amendment right to conflict-free counsel.  *State v. Dhaliwal*, 113 Wn. App. 226, 232, 53 P.3d 65 (2002).  Here, DJM, LKM, and LDM waived their right to conflict-free counsel.  Accordingly, we affirm their convictions.

A. WAIVER

DJM argues that her waiver of the potential conflict of interest arising from joint representation was invalid because it was not "fully informed," as required by RCW 13.40.140(10).  Br. of Appellant at 11.  We disagree.

A juvenile has the right to be represented by counsel at all critical stages of the proceedings.  RCW 13.40.140(2).  The right to counsel includes the right to conflict-free counsel.  *Dhaliwal*, 113 Wn. App. at 232.  RCW 13.40.140(10) provides that a juvenile's waiver of the right to counsel "must be an express waiver intelligently made by the juvenile after the juvenile has been fully informed of the right being waived."

DJM argues that, because of a juvenile's immaturity and lack of experience, perspective, and judgment, juveniles must be given extensive information in order to be fully informed of their rights before waiving them.  According to DJM, the juvenile court's limited explanation of the

9

potential conflict involved was insufficient because it did not educate DJM as to all aspects of potential conflict that could arise. Specifically, DJM asserts that, to have been fully informed regarding the potential conflict, the juvenile court was required to inform her that there was a potential for conflict to arise in investigation, presentation of evidence, cross-examination, presentation of defenses, objections, and pretrial motions. She also asserts that she should have been informed that she no longer had completely privileged and confidential communications with her attorney because information could be shared with her siblings. And she should have been informed that a conflict could arise regarding negotiation of a plea agreement.

DJM supports her argument by relying on *Saenz* and *Bailey*. *State v. Saenz*, 175 Wn.2d 167, 283 P.3d 1094 (2012); *State v. Bailey*, 179 Wn. App. 433, 335 P.3d 942 (2014). In *Saenz*, our Supreme Court held that a juvenile who waived juvenile court jurisdiction was not fully informed because there was no record of what the juvenile actually knew about the protection of the juvenile justice system at the time of the waiver. 175 Wn.2d at 177. And, in *Bailey*, Division Three of this court held that a juvenile was not fully informed regarding his decision to waive juvenile jurisdiction because he was not informed of the specific statutory rights and protections of the juvenile justice system. 179 Wn. App. at 440-41. Here, however, the meaning of being "fully informed" for the purposes of waiving juvenile court jurisdiction does not inform our analysis.

*Saenz* and *Bailey* enumerate the multitude of rights and protections available to juveniles in the juvenile justice system. It makes sense that to be fully informed regarding the waiver of these rights and protections, a juvenile must be informed of each right and protection. But in the

10

context of waiving a potential conflict of interest, similar concrete rights and protections do not exist. Because the issue is whether DJM waived the potential conflict of interest, the relevant inquiry is whether DJM was fully informed that the potential for a conflict of interest existed before she waived it.

DJM was repeatedly informed that there were concerns about joint representation because of the potential for a conflict of interest to arise. And the juvenile court illustrated the potential conflict of interest with the example of what might happen if the siblings began developing slightly different explanations about what happened. The juvenile court also warned DJM that additional conflicts might arise as the case developed, resulting in the issue of being raised again later. Together these warnings demonstrate that DJM was fully informed about the potential for a conflict of interest to arise and that she intelligently waived that risk. Because the juvenile court followed the same waiver process with LKM and LDM, and they were fully informed about the potential for a conflict of interest to arise, their waivers were also fully informed. Accordingly, we affirm the juvenile court's decision to allow joint representation for DJM, LKM, and LDM.

B.  ACTUAL CONFLICT OF INTEREST

Although DJM, LKM, and LDM executed a valid waiver of their right to conflict-free counsel, we note that, because they fail to establish an actual conflict of interest supported by the record, they would not be entitled to reversal regardless of whether the waiver was valid.  Even when the potential conflict of interest was not properly waived, joint representation is not a per se constitutional violation of the right to conflict-free counsel.  *State v. Byrd*, 30 Wn. App. 794, 798, 638 P.2d 601 (1981).  To be entitled to reversal, the appellant must show an actual conflict of interest adversely affecting the lawyer's performance.  *Dhaliwal*, 113 Wn. App. at 234-35.

The appellant bears the burden of demonstrating that an actual, as opposed to a potential, conflict of interest exists.  *Dhaliwal*, 113 Wn. App. at 237.  The actual conflict of interest must be readily apparent on the record.  *Dhaliwal*, 113 Wn. App. at 237.  An actual conflict of interest exists if "'the defendants' interests diverge with respect to a material factual or legal issue or to a course of action'" or "'where counsel must slight the defense of one defendant to protect another.'"  *Dhaliwal*, 113 Wn. App. at 237 (quoting *State v. Robinson*, 79 Wn. App. 386, 394, 902 P.2d 652 (1995)); *State v. James*, 48 Wn. App. 353, 369, 739 P.2d 1161 (1987).

DJM presents two examples of the alleged actual conflict of interest present in her case.  First, she claims that actual prejudice existed because the attorney jointly representing the children could not negotiate a plea deal for her.  Second, she claims that, at sentencing, the attorney could not argue that some of the siblings were less culpable than others because that would indicate higher culpability for another child.

12

Although DJM's allegations demonstrate *potential* conflicts of interest that could have arisen in the joint representation, she does not point to anything in the record to support her claims. There is nothing in the record that supports the allegation that, but for the joint representation, DJM could or would have negotiated a plea deal.

Nor can DJM demonstrate an actual conflict in regards to sentencing. DJM alleges that an actual conflict existed at sentencing because her attorney was precluded from arguing relative culpability among the siblings. She also alleges broadly that trial counsel was unable to argue individually for each appellant. The record belies the assertion that an actual conflict existed at sentencing. First, there was no conflict regarding relative culpability. Each juvenile was faced with standard range sentences.[5] Accordingly, the siblings' attorney argued for a manifest injustice disposition below the standard range.[6]

A "manifest injustice" is "a disposition that would either impose an excessive penalty on the juvenile or would impose a serious, and clear danger to society in light of the purposes of this chapter." Former RCW 13.40.020 (2014). The "relative culpability" of the siblings regarding the same fight has no bearing on the statutory criteria for imposing a manifest injustice sentence below

---

[5] Former RCW 13.40.0357 (2013) sets the standard range sentences for juvenile offenses. In some situations, the juvenile court has the discretion to impose "option B" (suspended confinement) or "option C" (mental health/chemical dependency treatment) alternatives to confinement. However, because the siblings were all adjudicated of second degree assault, none of them were eligible for any sentencing alternatives.

[6] RCW 13.40.160(6).

the standard range. Accordingly, there can be no actual conflict based on the failure to argue something that does not apply to the siblings' sentencing.

Although DJM has alleged two *potential* conflicts of interest, she has failed to point to specific areas of the record that demonstrate an actual conflict of interest. LKM and LDM do not assert any other argument supporting actual prejudice. Accordingly, the siblings' joint representation did not violate their right to conflict free counsel.

## II. SELF-DEFENSE AND DEFENSE OF OTHERS

At trial, all three siblings alleged some form of self-defense or the defense of others. DJM alleged that she was acting in self-defense because she feared CH due to bullying and harassment. LKM alleged that he began fighting to protect DJM. And LDM alleged that he began fighting with CH's friend, DH, to protect his siblings by preventing DH from intervening in the fight between DJM, LKM, and CH.

## A. LEGAL STANDARDS

There are three elements to self-defense: (1) the defendant subjectively feared imminent danger of bodily harm, (2) the defendant's belief was objectively reasonable, and (3) the defendant exercised no more force than reasonably necessary. *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010). The defendant's belief is not objectively reasonable if the apprehension of great bodily harm is based on words alone. *State v. Riley*, 137 Wn.2d 904, 912, 976 P.2d 624 (1999).

> [I]n general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation, unless he or she in good faith first withdraws from the combat at a time and in a manner to let the other person know that he or she is withdrawing or intends to withdraw from further aggressive action.

14

*Riley*, 137 Wn.2d at 909.

> An individual who acts in defense of another person, reasonably believing
> him to be the innocent party and in danger, is justified in using force necessary to
> protect that person even if, in fact, the party whom he is defending was the
> aggressor.

*State v. Bernardy*, 25 Wn. App. 146, 148, 605 P.2d 791 (1980).

B.  DJM'S SELF-DEFENSE CLAIM

On appeal, DJM argues that the juvenile court erred by concluding that she was the primary aggressor because the combination of bullying and smirking was sufficient provocation to make CH the primary aggressor.  DJM also argues that she was entitled to self-defense because, even if she was the primary aggressor, she withdrew from the conflict.  Both of these arguments fail.  The juvenile court properly concluded that DJM was not entitled to assert self-defense.[7]

It is undisputed that, on the day of the fight, CH was sitting down at a table eating breakfast when DJM walked up to him, punched him in the back of the head, and knocked him from his chair to the floor.  However, DJM claims that CH was the aggressor because he had repeatedly harassed DJM.  And on the day of the fight, DJM claims that CH smirked at her.  Neither of these allegations support a self-defense claim.

---

[7] We note that DJM assigns error to findings of fact VI, VII, X, XIV, and XXVI.  However, DJM does not argue that those findings are not supported by substantial evidence.  We do not consider assignments of error unsupported by argument and authority.  RAP 10.3(a)(6).

First, DJM claims that CH had repeatedly harassed her by making fun of her skin color and insulting her. DJM does not claim that any of CH's harassment resulted in physical violence toward her. In general, harassment that is purely verbal in nature cannot justify the use of force because mere words alone do not create a reasonable apprehension of great bodily harm. *Riley*, 137 Wn.2d at 912. Moreover, if words alone cannot support a self-defense claim, it stands to reason that a facial expression made by someone sitting and eating at a table, cannot create a reasonable apprehension of great bodily harm.

DJM also claims that the juvenile court erred by concluding that she did not act in self-defense because she had withdrawn from the fight after knocking CH out of the chair. In order to have withdrawn from the conflict, DJM must have acted in a manner that let CH know that she was withdrawing or intended to withdraw from the confrontation. But all the evidence establishes that after DJM punched CH and knocked him out of the chair, she just stood there. She did not say anything and she did not walk away. None of the facts, including her own testimony, establish that DJM took any action that would indicate she was withdrawing from the conflict. Accordingly, DJM cannot claim that she was entitled to use self-defense because she withdrew from the conflict after she initiated it.

## C. LKM's CLAIMS

LKM adopted the arguments in DJM's brief without additional argument or briefing. The juvenile court found that both DJM and LKM were aggressors against CH and, as a result, self-defense was not available to either of them. However, LKM testified that he began fighting CH because he wanted to protect his sister. DJM's self-defense argument relies on two assertions: (1)

16

that CH provoked the conflict through a pattern of harassment and smirking at her, and (2) that she withdrew from the conflict. Neither of these arguments apply to LKM. Nothing in the record establishes that CH had a history of harassing LKM. Nor was there any evidence that CH was smirking at LKM. In addition, there was not any evidence that LKM attempted to withdraw from the fight after engaging CH.

Because LKM has failed to present any argument or authority regarding the juvenile court's application of self-defense or the defense of others to his specific case, we decline to address it any further. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (we do not consider grounds unsupported by argument or citation to authority).

D. LDM'S CLAIMS

LDM argues that there is insufficient evidence to support his adjudication because the State did not prove that LDM did not act in defense of others. Because LDM does not argue that the superior court erred by concluding that he was not entitled to raise a defense of others claim, his argument fails.

LDM argues that there is insufficient evidence to support his adjudication because the State did not prove that LDM did not act in defense of others. LDM assigns error to the juvenile court's findings of fact VIII, IX, X, XII, XIII, XVI, XIX, XX, and XXIX. However, LDM presents arguments only regarding finding of fact XX. Finding of fact XX states,

Given Mr. Wiedow's directions and actions being ignored by his siblings, LDM could not reasonable (*sic*) believe either of his siblings were innocent parties in the altercation with CH.

Clerk's Papers at 99. Thus, we review only the challenge to finding of fact XX. RAP 10.3(a)(6). We review whether substantial evidence supports the juvenile court's findings of fact and, in turn, whether the findings support the conclusions of law. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014), *as corrected*, 191 Wn. App. 759 (2016).

LDM argues that this finding is unsupported because there was no evidence demonstrating that LDM knew what Wiedow had concluded about who was the initial aggressor in the fight. But this finding of fact does not impute Wiedow's conclusions to LDM. Instead, it is based on LDM's reactions to what LDM observed—specifically his siblings refusing to comply with instructions to stop fighting and resisting Wiedow's attempts to break up the altercation. Wiedow testified that DJM and LKM continued the altercation after he intervened and tried to break up the fight. Therefore, finding of fact XX is supported by substantial evidence.

LDM also argues that, legally, finding of fact XX does not support the conclusion that LDM was not acting in defense of his siblings. We disagree. To have been acting in defense of his siblings, LDM had to have had a reasonable belief that his siblings were innocent parties and in danger. *Bernardy*, 25 Wn. App. at 148. Here, DJM's and LKM's refusal to comply with Wiedow's attempts to stop the fight makes it unreasonable to believe that they were innocent parties because innocent parties to a fight would not attempt to continue the fight after security intervenes. Therefore, the juvenile court properly concluded that, based on observing DJM and LKM repeatedly refusing to comply with Wiedow's attempts to intervene and stop the fight, LDM

18

did not reasonably believe that DJM and LKM were innocent parties in the fight. Thus, the juvenile court's findings of fact supports the court's conclusion that LDM was not acting in defense of his sibling.

### III. RIGHT TO JURY TRIAL

DJM argues that "the time has come" to grant juvenile defendants the right to a jury trial. Br. of Appellant at 21-22. DJM urges us to declare RCW 13.04.021(2) unconstitutional because juvenile adjudications are now indistinguishable from adult adjudications. RCW 13.04.021(2) explicitly states that "[c]ases in juvenile court shall be tried without a jury."

Whether RCW 13.04.021(2) is unconstitutional because juveniles are entitled to a jury trial is a question of law that we review de novo. *State v. Womac*, 160 Wn.2d 643, 649, 160 P.3d 40 (2007). Our Supreme Court resolved this issue in *State v. Chavez*, 163 Wn.2d 262, 272, 180 P.3d 1250 (2008). In *Chavez*, our Supreme Court unequivocally rejected the argument that juveniles are entitled to a jury trial under the Sixth Amendment of the United States Constitution and under article 1, sections 21 and 22 of the Washington Constitution. 163 Wn.2d at 272, 274. *Chavez* controls here, therefore, DJM's argument fails.

### IV. CONDITIONS OF DISPOSITION

LKM argues the juvenile court erred by entering indefinite no-contact orders protecting CH as conditions of his disposition. The State concedes that the juvenile court exceeded its authority under the Juvenile Justice Act, chapter 13.40 RCW, by imposing the no-contact orders. The State's concession is proper. Accordingly, we reverse the juvenile court's imposition of a no-contact order as a condition of disposition and remand for the juvenile court to strike it.

RCW 13.40.185 governs how a juvenile court designates confinement in a disposition order.  And former RCW 13.40.190 (2014) allows the juvenile court to impose restitution in a disposition order.  Only RCW 13.40.210 addresses imposing additional conditions on juveniles following a disposition.  RCW 13.40.210(3)(b) states:

> The secretary [of the Department of Social and Health Services] shall, for the period of parole, facilitate the juvenile's reintegration into his or her community and to further this goal shall require the juvenile to refrain from possessing a firearm or using a deadly weapon and refrain from committing new offenses and may require the juvenile to:  (i) Undergo available medical, psychiatric, drug and alcohol, sex offender, mental health, and other offense-related treatment services; . . . (ix) refrain from contact with specific individuals or a specified class of individuals; (x) meet other conditions determined by the parole officer to further enhance the juvenile's reintegration into the community.

Here, the relevant statutes provide the secretary of the Department of Social and Health Services, not the juvenile court, the authority to impose additional conditions following release from confinement.  Accordingly, the juvenile court exceeded its authority by imposing additional conditions of disposition on DJM, LKM, and LDM.  We reverse the juvenile court's imposition of additional conditions of disposition on DJM, LKM, and LDM and remand to strike the conditions.

We affirm DJM's, LKM's, and LDM's adjudications for second degree assault, but reverse the juvenile court's additional conditions of disposition.  We remand for further

20

No. 48093-0-II
(Cons. w/ Nos. 48096-4-II
  and 48103-1-II)

proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

We concur:

Worswick, J.

Maxa, A.C.J.