# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| STATE OF WASHINGTON, | No.  50796-0-II |
| Respondent, | |
| v. | |
| DEAN MICHAEL O'NEAL, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — A jury returned verdicts finding Dean O'Neal guilty of first degree

unlawful possession of a firearm and three counts of first degree assault.  O'Neal appeals from

his first degree assault convictions, asserting that (1) the trial court erred by providing a first

aggressor jury instruction, (2) the prosecutor committed misconduct during closing argument, (3)

his defense counsel was ineffective for failing to object to the prosecutor's alleged misconduct

and to the first aggressor jury instruction, and (4) the cumulative effect of the prosecutor's

misconduct denied him a fair trial.  In his Statement of Additional Grounds (SAG) for Review,

O'Neal appeals from all of his convictions, asserting that (5) his Sixth Amendment confrontation

right was violated, (6) the State violated his due process right by presenting the testimony of

numerous police witnesses, (7) the prosecutor committed several instances of misconduct, and (8) his defense counsel was ineffective for failing to object to the prosecutor's misconduct.

We hold that the trial court erred in giving the first aggressor jury instruction and that this error was not harmless. Consequently, we affirm O'Neal's first degree unlawful possession of a firearm conviction, but we reverse his first degree assault convictions and remand for a new trial on those charges.

FACTS

On April 4, 2016, Tacoma Police Officer Leslie Jacobson responded to a report of multiple gunshots fired at a gas station in Tacoma's Hilltop neighborhood. When Officer Jacobson arrived, a nearby resident told her that a bullet had struck his neighbor's gas meter. Officer Jacobson saw bullet damage to the gas meter and to two nearby houses. Officer Jacobson also saw bullet damage to three of the gas station's gas pumps. Police officers recovered a bullet and five shell casings from the scene.

Tacoma Police Detective Kimberly Cribbin retrieved security video footage of the shooting incident. The video shows a white Ford sedan pull into a crowded gas station parking lot and stop next to a gas pump. A white male, later identified as O'Neal, exits the passenger side of the car and appears to exchange words with three occupant-colored vehicle at a different gas pump. Several other vehicles are at the gas station, including a maroon Dodge. As the dark-colored vehicle starts to drive away from the gas pump, O'Neal leans into the white Ford through the front passenger side window. A female passenger in the dark-colored vehicle leans her upper body out of the back window and appears to say something to O'Neal while the vehicle slowly exits the parking lot. The passenger is also waiving her hand and it appears she is either holding

a pistol or pointing her finger and making a gun-like gesture. O'Neal walks toward the dark-colored vehicle, pulls out a handgun from his waistband, and quickly fires a shot before walking back to the white Ford. As the dark-colored vehicle drives on the street in front of the gas station, O'Neal appears to take cover from shots fired in his direction before firing multiple shots at the dark-colored vehicle.

On May 5, 2016, the State charged O'Neal with first degree unlawful possession of a firearm and three counts of first degree assault. On May 21, 2016, Pierce County Sheriff's Deputy Matthew Smith initiated a traffic stop on a vehicle in which O'Neal was a passenger. Deputy Smith arrested O'Neal after a records check showed that he had a felony arrest warrant for his alleged conduct at the gas station. Deputy Smith told O'Neal that he was being arrested for suspected first degree unlawful possession of a firearm and three counts of first degree assault. O'Neal was visibly upset and crying while waiting to be booked at the jail, stating, I am "going to be in prison for life over this." 2 Verbatim Report of Proceedings (VRP) at 195.

Tacoma Police Detective Vicki Chittick interviewed Danielle Carter, a person associated with the maroon Dodge that was at the gas station on the night of the shooting. Based on information obtained during her interview with Carter, Detective Chittick sought to locate and interview Alyxandria McGriff, Jessica Handlen, and Christopher Legg. Detective Chittick interviewed McGriff and Legg but could not locate Handlen. During her interview with Legg, Legg told Detective Chittick that he was shot at but that he did not know who shot at him. Legg

then told Detective Chittick that he doesn't speak with police before leaving the room and slamming the door.[1]

Detective Chittick also interviewed O'Neal at the jail. Detective Chittick told O'Neal that he had been identified as the shooter, and showed him photographs taken from the security video. O'Neal denied having knowledge of the shooting incident and said that he would not say anything even if he knew something "because he wasn't a rat or a snitch." 3 VRP at 299. Before trial, the State obtained material witness warrants for McGriff, Handlen, Carter, and Legg. Only Legg appeared at trial to testify.

At trial, Officer Jacobson, Detective Cribbin, Deputy Smith, and Detective Chittick testified consistently with the facts stated above. The security video showing the shooting was played for the jury.

Detective Chittick also testified that people who are shot at are not always willing to cooperate with police and that courts may have to issue material witness warrants to compel people to testify at trial. Detective Chittick stated that multiple warrants had to be issued to compel Legg to testify and that there were outstanding material witness warrants for Carter, Handlen, and McGriff. Detective Chittick said that she believed Carter was in Idaho and that material witness warrants are not enforced outside of the issuing state. The State asked Detective Chittick about Carter's unwillingness to return to Washington to testify, and defense counsel objected. The trial court sustained the objection, stating that there was not adequate foundation for Detective Chittick to testify about Carter's reasons for not returning to Washington to testify.

---

[1] Chittick's testimony regarding Legg's statements were admitted at trial for the limited purpose of determining Legg's credibility.

Drake Ackley testified that he lives in Gig Harbor and was at the Tacoma gas station on the night of the shooting. Ackley stated that he was looking between the seats of his car for his cell phone when he heard gunshots. Ackley also stated that immediately before hearing the gunshots, he heard a female voice yelling or screaming something in a hostile manner. Ackley said that it "sounded like something was about to happen, like I figured someone was about to get beat up or something." 3 VRP at 357. When the State asked whether he could detect an accent in the female's voice, Ackley responded that it sounded "like a hood rat tone." 3 VRP at 357. The State asked what a "hood rat tone" meant, and Ackley stated, "Very street, ethnic tone." 4 VRP at 358.

Legg testified that he did not remember being at a gas station during a shooting. Legg stated that he did not recognize himself or the car in the security video footage. Legg further stated that he remembered Detective Chittick attempting to interview him but that he does not talk to police. Legg denied telling Detective Chittick that he was at the gas station on the night of the shooting or that someone had shot at him.

O'Neal also testified. He admitted that he was the person on the security video firing a handgun but claimed he was acting in self-defense. O'Neal testified that he heard a female screaming and yelling at him. O'Neal stated that he saw the female hanging out the back of a car and that he thought he saw a gun. O'Neal said that he heard a gunshot and fired one shot because he felt threatened and was afraid of getting shot again. O'Neal stated that more gunshots were fired at him and that he took cover before returning fire at the vehicle. O'Neal also testified that he had been shot in the stomach in 2015 and required the use of colostomy bag.

On cross-examination, the State asked O'Neal, "The colostomy bag that you have, it's because you shot yourself, right?" 5 VRP at 438. When O'Neal answered, "No," the State asked him who had shot him, to which O'Neal replied that he did not know. 5 VRP at 439. When asked why he did not report the 2015 shooting to the police, O'Neal responded that he did not have any reason for not reporting it. O'Neal also testified that he did not remember who was in the car with him on the night of the shooting.

The trial court provided the jury with a first aggressor instruction that stated:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers (CP) at 58. Defense counsel did not object to this instruction.

During closing, the State argued:

> Victims of a shooting who nearly got killed that night, who don't stick around and don't want to cooperate or report to the police.
> The defendant, who nearly kills others and nearly gets a whole bunch of other people, innocent bystanders, killed that night, who doesn't want to stick around and tell the police about what he did.
> Whole bunch of people in that parking lot that night, who once the scene is safe and once these players are all out of there don't want to stick around because they know the police are coming and have no interest in reporting to the police what happened that night.
> Witnesses and victims of crimes who don't want to come in and testify. Warrants have to be issued for them to try and find them, and when they are found are told by the Court you stay in touch with the state, you stay in touch with the prosecutor, and then they just disappear again. And even when they are found, they get on the stand and they tell you something entirely different from what they told a detective.
> Someone like the defendant who takes the stand, swears to tell the truth, and then just lies through his teeth.
> All of it, all of it is a black eye and shameful, shameful, all of it, all around.

And what it tells you is that you cannot always rely on human beings to do the right thing. That more often than not all someone cares about is me. I don't care about how dangerous this was. I don't care about doing the right thing and coming in to testify. I don't care about honoring the oath I swear to tell the truth. I just don't care. What's most in my personal interest.

And so what it should tell you is that when you can't rely on human beings to do the right things, you have to look for other types of proof, other types of evidence.

6 VRP at 511-12. O'Neal did not object to this argument. Later in its closing argument, the State discussed the legal standards for evaluating a self-defense claim as provided in the jury instructions, stating:

The law talks about what would a reasonably prudent person do. Not what Dean O'Neal would do, because Dean O'Neal would tell you that I had to act in self-defense no matter what. What would a reasonably prudent person do.

And you're reasonably prudent people. That's your job, to decide what a reasonably prudent person would do.

The law also talks about look at all the circumstances, everything that was happening, to gauge whether a reasonably prudent person would have done what the defendant did that night.

If—if, hypothetically, someone from that car did shoot first, but then they're driving off and they are no longer a threat to you, you don't get to return fire and call it self-defense, because it's not necessary.

6 VRP at 523. During the defense closing, defense counsel referred to O'Neal's interview statement to Detective Chittick that he would not tell the police anything because he's not a snitch or rat, arguing:

If [O'Neal is] the one that's guilty, if he's the one that initiated this whole thing, if he's the one that's just pulling out guns willy-nilly and shooting at people, what's he going to snitch or rat somebody else about?

Because they're the ones that started it and he wasn't going to snitch and rat on them. That's exactly what he meant by that.

Call it the code of the street. Call it whatever you want to call it. But it speaks volumes about what truly happened and creates a reasonable doubt right there as to whether [O'Neal] assaulted anybody and/or who initiated this incident.

6 VRP at 549.  Defense counsel also argued that certain witnesses may not have wanted to testify

because they were the ones who initiated the shooting incident.  Defense counsel also referred to

Ackley's testimony regarding a female yelling something in a hostile tone, stating, "If Mr.

Ackley can have that same uneasy queasy feeling that something is about to happen, why can't

Dean O'Neal have that same uneasy queasy feeling that something bad is about to happen."  6

VRP at 557.

The State addressed defense counsel's reference to Ackley's testimony in its rebuttal

closing, arguing:

> Do not compare those two people.  Mr. Ackley, *straightlaced from Gig Harbor* is not the defendant.  Mr. Ackley, coming over at midnight to the Hilltop to get some gas, doesn't have the same state of mind as the defendant.
> Yeah.  Mr. Ackley there at midnight hears a woman yelling, hears a woman taunting, hears a woman running her mouth.  It probably did make him queasy.  Anyone who's just a normal, everyday person who sees that unfold at a gas station would get uncomfortable.
> Maybe you've been there and just someone is acting crazy; someone is being stupid; someone is creating drama and makes you uncomfortable.
> And of course, it really makes Mr. Ackley uncomfortable when he thinks about that in the context of what happened afterwards.
> But just because Mr. Ackley got uncomfortable with what he heard that night doesn't tell you that what the defendant did was justified.  Because you don't get to shoot someone for running their mouth.

6 VRP at 575-76 (emphasis added).  Finally, in rebuttal the State argued:

> When you talk about self-defense, it's very tempting to say well, no one got hit that night, or the victims are probably dirtbags, or the victims don't care so why should we.  It's very tempting to have that state of mind.
> But be mindful of how dangerous this was in the bigger picture.  Be mindful how innocent people could have been hit and killed that day.
> And when you're thinking about the idea that this was self-defense, remember what you're justifying.  When you say that something is self-defense, you say that pulling that trigger was justified, consequences be damned.
> Wherever that bullet goes after it leaves the barrel of that gun, it's irrelevant to the equation.

You are saying that in the moment that the defendant pulled that trigger that was a lawful act of self-defense, and whatever happens as a result is irrelevant to the equation. The fact that no one was hit, irrelevant. If someone driving down Sprague had been hit, caught in the crossfire, tragic, irrelevant to the equation.

If that bullet pierces that gas vein at 1018 South Sprague Street and the home erupts, tragic. But the act of pulling that trigger was justified.

So whatever your conclusion is about self-defense, make sure that you're comfortable with that conclusion regardless of the consequences, because the consequences tell you the reasonableness of the actions.

6 VRP at 576-77. Defense counsel did not object to this argument.

The jury returned verdicts finding O'Neal guilty of first degree unlawful possession of a firearm and three counts of first degree assault. The jury also returned special verdicts finding that O'Neal was armed with a firearm during his commission of the first degree assaults. The trial court imposed an exceptional downward sentence of 342 months of incarceration and 36 months of community custody. O'Neal appeals his first degree assault convictions.

ANALYSIS

I. FIRST AGGRESSOR JURY INSTRUCTION

O'Neal contends that the trial court erred by providing the jury with a first aggressor instruction because his only alleged conduct provoking the need to act in self-defense was the charged assault itself. We agree that it was error to provide a first aggressor jury instruction because the only provoking act was O'Neal's assault itself. We further hold that the constitutional error was not harmless beyond a reasonable doubt, and therefore, we reverse O'Neal's first degree assault convictions and remand for a new trial.

1. *RAP 2.5(a)(3)*

As an initial matter, we must determine whether O'Neal may challenge the first aggressor jury instruction for the first time on appeal because he did not object to the instruction at trial.

9

To raise the issue for the first time on appeal, O'Neal must show that giving the instruction involves a manifest error affecting a constitutional right. RAP 2.5(a)(3).

Due process requires the State to prove beyond a reasonable doubt every element of a charged offense. *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). If a defendant claims self-defense, the State bears the burden of proving the absence of self-defense beyond a reasonable doubt. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A first aggressor instruction may prevent a jury from considering whether the State has proved beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Bea*, 162 Wn. App. 570, 575-76, 254 P.3d 948 (2011). Therefore, O'Neal has shown that the first aggressor instruction implicated his constitutional due process rights.

Next, O'Neal must show that it was manifest error for the trial court to provide the first aggressor jury instruction. To show manifest error warranting review for first time on appeal under RAP 2.5(a)(3), O'Neal must demonstrate that the alleged error had "practical and identifiable consequences apparent on the record that should have been reasonably obvious to the trial court." *O'Hara*, 167 Wn.2d at 108. In other words, an error is manifest where "given what the trial court knew at [the] time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 100. O'Neal has met this showing.

Generally, a defendant cannot claim self-defense when he or she was the aggressor provoking an altercation. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). Therefore, "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate." *Riley*, 137 Wn.2d at 909-10. The first provoking act must be an act that a "'jury could

10

reasonably assume would provoke a belligerent response by the victim.'" *Bea*, 162 Wn. App. at 577 (internal quotation marks omitted) (quoting *State v. Wasson*, 54 Wn. App. 156, 159, 772 P.2d 1039 (1989)).

A first aggressor instruction is appropriate even where there is conflicting evidence as to whether the defendant's conduct provoked the altercation. *Riley*, 137 Wn.2d at 910. But a first aggressor instruction is inappropriate where the evidence shows the defendant's "words alone" provoked the altercation or where the defendant's alleged conduct provoking the need to act in self-defense was the charged assault itself. *Riley*, 137 Wn.2d at 910-11; *State v. Brower*, 43 Wn. App. 893, 901-02, 721 P.2d 12 (1986).

Here, our review of the record leads us to conclude that the trial court erred by providing the jury with a first aggressor instruction because O'Neal's conduct that allegedly provoked the need to act in self-defense was the charged assault itself. The State concedes that there was no evidence presented of a prior conflict between O'Neal and the victims before the altercation at the gas station. But the State argues that O'Neal's conduct in walking toward the victims' vehicle as it was exiting the gas station, drawing his gun, and firing a shot was sufficient to warrant a first aggressor jury instruction.

The State's argument that O'Neal's conduct in firing a shot supported the first aggressor instruction clearly fails because this conduct was part of the actual charged assaults. To support a first aggressor instruction, the evidence would have to show that O'Neal made an intentional act *before* the shooting that a jury could reasonably assume would provoke a belligerent response.

The State's argument that O'Neal's conduct in walking towards the victims' vehicle and pulling out his handgun supported a first aggressor instruction also fails. The video exhibit shows O'Neal firing a shot immediately after pulling out the handgun. Therefore, the facts here are distinct from *Riley*, where the defendant's intentional conduct in brandishing a firearm at the victim before firing was sufficient to warrant a first aggressor instruction. 137 Wn.2d at 906, 909-10. And O'Neil's conduct in walking toward the victims' vehicle similarly fails to support a first aggressor instruction because a jury could not reasonably assume that merely walking toward the vehicle would provoke a belligerent response. Again, the video exhibit shows O'Neal walking toward the vehicle before pulling out a handgun and firing a shot. O'Neal does not make any gestures while walking toward the vehicle and there was no evidence that he hurled any threats while walking toward the vehicle. Given the innocuous nature of O'Neal's conduct in approaching the vehicle, this conduct alone is insufficient to warrant a first aggressor instruction.

Because there is no evidence that O'Neal made an intentional act *before* the charged assault that a jury could assume would provoke a belligerent response, he has shown that providing the jury with a first aggressor instruction was manifest error. This does not end our inquiry however, as the State may show that the constitutional error in providing the first aggressor instruction was harmless beyond a reasonable doubt.

2. *Harmless Error*

Where, as here, a trial error is of constitutional magnitude, "prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt." *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). The issuance of an erroneous first

aggressor instruction is harmless beyond a reasonable doubt if no reasonable jury could have determined that the defendant's acts constituted lawful self-defense. *State v. Kidd*, 57 Wn. App. 95, 101, 786 P.2d 847 (1990). Our review of the evidence presented at trial, including the video exhibit showing O'Neal's assaults, leads us to conclude that the State has not met its burden of proving constitutional harmless error.

The video exhibit presented at trial shows that, prior to O'Neal firing his handgun, a female passenger of the alleged victims' vehicle leaned her upper body out of the back window and waved her hand in a manner in which it appears she could either be holding a handgun or pointing her finger in a gun-like gesture. Based on this evidence, a reasonable jury could have found that O'Neal's conduct in firing his handgun constituted lawful self-defense. The first aggressor instruction, however, permitted the jury to improperly find that O'Neal was the first aggressor based on this same act and, by doing so, relieved the State of its burden to prove beyond a reasonable doubt that O'Neal was not acting in self-defense. On the record before us, the State cannot meet its burden to prove this error harmless beyond a reasonable doubt. Accordingly, we reverse O'Neal's first degree assault convictions and remand for a new trial.

## II. PROSECUTORIAL MISCONDUCT

Although we reverse O'Neal's first degree assault convictions based on the instructional error discussed above, we address some of his remaining contentions because they may again arise at a new trial. Specifically, we address O'Neal's contention that the prosecutor committed misconduct at closing by arguing that the jury should consider the potential consequences of his firing a gun at the gas station when determining whether he acted in self-defense.

To establish prosecutorial misconduct, a defendant bears the burden of proving the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). If a defendant shows that the prosecutor's conduct was improper, we must determine whether the improper conduct prejudiced the defendant. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). A prosecutor's improper conduct results in prejudice when "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" *Thorgerson*, 172 Wn.2d at 443 (alteration in original) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).

Where, as here, a defendant fails to object to alleged prosecutorial misconduct, the defendant is deemed to have waived any error unless he or she shows that the misconduct was so flagrant and ill-intentioned that an instruction from the trial court could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. To meet this heightened standard, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

O'Neal contends that the prosecutor's discussion of the potential consequences of his firing a gun at a crowded gas station near residential homes improperly appealed to the jury's passions and prejudices because it requested the jury to convict even if it found he acted in self-defense based on the potential injury that could result from firing a gun in a public place. We agree.

14

It is improper for a prosecutor to "'use arguments calculated to inflame the passions or prejudices of the jury.'" *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). A prosecutor improperly appeals to the passions and prejudices of a jury when arguing for the jury to convict a defendant "in order to protect the community, deter future law-breaking, or other reasons unrelated to the charged crime." *State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011) (discussing holding in *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991)).

Here, the prosecutor argued that the jury should consider the "bigger picture" of how "dangerous" firing a gun at a gas station was when determining whether O'Neal acted in self-defense. 6 VRP at 576. The prosecutor also argued that the jury should be "mindful" of the potential injury to persons and property that could have occurred when deciding whether O'Neal's firing of a handgun was "justified, consequences be damned." 6 VRP at 576-77. And the prosecutor argued that, should the jury determine that O'Neal acted in self-defense, it would be justifying the "tragic" consequences that could have occurred from his act, such as "someone driving down" the street being "caught in the crossfire" or a home erupting as a result of a "bullet pierc[ing a] gas vein." 6 VRP at 577. Additionally, and perhaps most concerning, the prosecutor argued that the jury must be "comfortable" with these potential extraneous and hypothetical consequences when deciding whether O'Neal acted in self-defense. 6 VRP at 577.

These arguments were an improper appeal to the jury's passions and prejudices. The arguments urged the jury to not only consider whether the facts presented at trial supported O'Neal's self-defense claim, but also whether O'Neal's self-defense claim was justified in light

15

of "bigger picture" potential consequences that may result from such conduct. 6 VRP at 576.

Although the prosecutor attempted to tie these arguments to the reasonableness standard of

evaluating a self-defense claim as set forth in the jury instructions,[2] stating that "the

consequences tell you the reasonableness of the actions," we conclude that the arguments were

so removed from the appropriate reasonableness standard as to constitute a bare emotional

appeal to the jury's passions and prejudices. 6 VRP at 577. Accordingly, we hold that the

argument was improper. Because we reverse O'Neal's first degree assault convictions based on

instructional error, we do not address whether the prosecutor's improper argument resulted in

prejudice that was incurable by a jury instruction.

---

[2] The trial court provided a self-defense jury instruction that provided in relevant part:

> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

CP at 55. The trial court also provided the following definitional jury instruction:

> Necessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended.

CP at 56.

### III. SAG

Because it appears that O'Neal raises issues related to all of his convictions, we address his SAG.

A.    *Confrontation Right*

O'Neal first contends in his SAG that his Sixth Amendment right to confront witnesses against him was violated because two of the alleged occupants of the vehicle at which he shot did not testify at trial. We disagree.

The Sixth Amendment of the United States Constitution guarantees a criminal defendant's right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause of the Sixth Amendment "bars the admission of 'testimonial' hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." *State v. O'Cain*, 169 Wn. App. 228, 235, 279 P.3d 926 (2012); *see also State v. Koslowski*, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

Here, the trial court did not admit any statements made by the alleged occupants of the vehicle who did not testify at trial. Accordingly, O'Neal's confrontation right claim fails.

B.    *Due Process*

Next, O'Neal appears to contend that his due process right was violated because the State presented testimony from several law enforcement officers. O'Neal does not explain how testimony from multiple law enforcement officers implicate his due process rights. And although O'Neal is not required to provide citations to authority to support his SAG claims, he must "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). O'Neal's bare assertion that testimony from multiple law enforcement officers violated his due process

right is insufficient to meet this requirement. *See also State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("Parties raising constitutional issues must present considered arguments to this court. We reiterate our previous position: 'naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'") (internal quotation marks omitted) (quoting *In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)).

To the extent that O'Neal is contending that the trial court should have excluded certain law enforcement testimony as cumulative under ER 403, this contention cannot succeed. O'Neal did not object below to any officer testimony on the basis that it was needlessly cumulative under ER 403. *See State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) ("A party may assign evidentiary error on appeal only on a specific ground made at trial.").

## C.    *Prosecutorial Misconduct*

Next, O'Neal contends that the prosecutor committed several instances of misconduct at trial and during closing argument. We disagree.

First, O'Neal asserts that the prosecutor committed misconduct when it asked, "I was unclear about something. If you're to be believed, Mr. O'Neal—" 5 VRP at 457. Defense counsel objected before the prosecutor finished its question. The trial court did not rule on the objection but instead asked the prosecutor to ask its question. When the prosecutor resumed the question, he rephrased it in a manner that did not state anything about a belief in O'Neal's testimony. Because the prosecutor rephrased its question following an objection, we discern nothing improper in this exchange to support a claim of misconduct.

Next, O'Neal asserts that the prosecutor committed misconduct by asking him on cross-examination about being shot in 2015 and asking why he did not report the 2015 shooting to

police. But O'Neal testified on direct examination about being shot in 2015 and stated that he had fired a shot at the alleged victims' vehicle because he feared "being shot again." 5 VRP at 436. And defense counsel argued at closing that O'Neal acted in self-defense when firing a shot because "[h]e was on guard about getting shot again and didn't want that to happen." 6 VRP at 555. Because O'Neal raised the issue of his previous gunshot wound during direct examination, it was proper for the State to inquire about that incident during cross-examination. Accordingly, O'Neal's claim of prosecutorial misconduct on this ground fails.

Next, O'Neal appears to assert that the prosecutor committed several instances of misconduct in closing argument by commenting on his credibility and his guilt to the charged offenses. We will not find prejudicial error unless it is clear and unmistakable that the prosecutor was expressing a personal opinion. *State v. Jackson*, 150 Wn. App. 877, 883, 209 P.3d 553 (2009). Here, the prosecutor's comments about O'Neal's veracity and guilt do not clearly and unmistakably express a personal opinion. Accordingly, the prosecutor's comments on O'Neal's veracity and guilt were not improper, and his claim of prosecutorial misconduct on this ground fails.

D. *Ineffective Assistance of Counsel*

Finally, O'Neal contends in his SAG that his defense counsel was ineffective for failing to object to the prosecutor's alleged misconduct in commenting on his credibility and his guilt to the charged offenses. Having failed to demonstrate that the prosecutor committed misconduct on these bases, O'Neal cannot show that his defense counsel was ineffective for failing to object.

We affirm O'Neal's first degree unlawful possession of a firearm conviction, but we reverse his first degree assault convictions and remand for a new trial on those charges.

19

No. 50796-0-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Lee, A.C.J.

_____
Cruser, J.