**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57320-2-II |
| Respondent, | |
| v. | |
| CURTIS MORGAN SWORD, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J. — Curtis Morgan Sword pointed a gun at two people who intervened when they believed he was trying to steal their neighbor's motorcycle. Police recovered the gun when they arrested him. Law enforcement testimony in Sword's trial primarily addressed the search for Sword based on witnesses' descriptions, his arrest, and the recovery of the gun from his person. A jury convicted Sword of two counts of second degree assault while armed with a firearm and one count of first degree unlawful possession of a firearm.

Sword appeals his convictions and sentence. He argues that the trial court erred by seating a biased juror who stated that she thought police officers were more likely to tell the truth than other people and that his counsel provided ineffective assistance when they failed to further question or challenge that juror. Sword asserts that the trial court abused its discretion by admitting evidence of multiple prior serious offense convictions. Sword also contends that defense counsel rendered ineffective assistance by failing to seek a revived self-defense instruction. And he argues that the prosecutor committed misconduct by misstating the State's burden of proof in closing

argument and that cumulative errors denied him a fair trial. Sword also raises several issues related to legal financial obligations and alleged errors in his judgment and sentence.

Although the prosecutor made improper remarks about the State's burden of proof in closing argument, we conclude that Sword has failed to establish prejudice. We remand for the trial court to strike the filing fee, supervision fee, and crime victim penalty assessment from Sword's judgment and sentence and correct a scrivener's error. We otherwise affirm.

## FACTS

After receiving a call about a man brandishing a gun, police arrested Sword and found a gun when they frisked him during the arrest. A witness reported that Sword was trying to steal a motorcycle, and when neighbors intervened, he pointed a gun at them. The State eventually charged Sword with two counts of second degree assault and one count of first degree unlawful possession of a firearm. The second degree assault charges each carried a firearm sentencing enhancement.

### I. PRELIMINARY PROCEEDINGS

A.     Motions in Limine

A person commits first degree unlawful possession of a firearm if they possess a firearm after being convicted of a serious offense. Former RCW 9.41.040(1)(a) (2021). Any violent crime is a serious offense. Former RCW 9.41.010(26)(a) (2019). Sword had two prior convictions for second degree assault arising from the same incident and one prior conviction for residential burglary, which were all violent crimes and therefore serious offenses. Former RCW 9.41.010(4)(a). Sword did not stipulate that he had previously been convicted of a serious offense

for the purposes of the unlawful possession of a firearm charge, requiring the State to prove this fact at trial.

During motions in limine, Sword sought to limit what the jury would learn about his criminal history. Sword moved to require the State to elect a single offense to use as evidence that he had previously been convicted of a serious offense for purposes of the unlawful possession of a firearm charge. The State responded that it was entitled to present evidence of multiple serious offenses because Sword had not stipulated to committing a prior serious offense. It also asserted that there was a risk after *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), that future court rulings might similarly invalidate one of the prior convictions.

The trial court denied the motion to limit the State to offering evidence of a single prior conviction. The trial court emphasized that Sword could have chosen to stipulate to having committed a serious offense. "While there will always be some prejudice when criminal history is used as evidence, in this case, the probative value is not substantially outweighed by unfair prejudice." Clerk's Papers (CP) at 83.

B.    Jury Selection

During voir dire, the judge, the State, and defense counsel each asked questions of panels of 24 prospective jurors. Defense counsel queried the first panel about their opinions of law enforcement, asking, "Are police officers more likely to tell the truth than other people . . . on the stand?" Verbatim Rep. of Proc. (VRP) (Feb. 28, 2022) at 108. Juror 1 answered, "Yes," as did prospective jurors 6 and 8. *Id*. at 108-09. In response to other questions, prospective jurors 6 and 8 reported that they had close friends and family who worked in law enforcement. Juror 1 did not say that she or any of her close family or friends worked in law enforcement.

3

Sword has tattoos on his neck. When defense counsel asked the panel, juror 1 did not express a negative reaction to face or neck tattoos, though other prospective jurors did so. She did not have "any strong feelings about crimes against people" or about people charged with assault. *Id*. at 46. She did not report knowing anyone who had been assaulted. Juror 1 did not raise any concerns about the allegation that Sword had previously been convicted of a serious offense. And she did not report any strong feelings about homeless people.

Defense counsel did not ask the second panel of jurors their opinion about law enforcement honesty. But defense counsel challenged two prospective jurors from the second panel for cause based on counsel's view that they had expressed a bias in favor of police in their answers to other questions. The trial court granted the motion to dismiss one prospective juror for bias but denied the other.

The State and defense counsel each received six peremptory challenges. Defense counsel exercised peremptory challenges to remove prospective jurors 6 and 8 from the panel. Counsel also exercised peremptory challenges against four other prospective jurors, exhausting their six challenges. Juror 1 was seated on Sword's jury.

II. TRIAL

A.      Evidence Presented

1.      The incident

At trial, Melissa Miller and Nicholas Ketchum explained that they were siblings who lived together in a first-floor apartment. One of their neighbors parked his motorcycle outside Miller's bedroom window on the backside of the apartment.

4

The night of the incident, Miller saw a man who was not the owner "messing with" the motorcycle outside her bedroom window. VRP (Mar. 1, 2022) at 392. Miller and Ketchum had seen the same man around the apartment complex and around the motorcycle before. They later identified the man as Sword. The motorcycle's owner testified that he never gave anyone permission to borrow his motorcycle. And he did not recognize Sword.

Miller testified that she began yelling at Sword through the window to leave the motorcycle alone, and she alerted her brother to what was going on. Ketchum testified that he confronted Sword outside near the motorcycle. Sword claimed to own the motorcycle, which Ketchum knew was not true. Ketchum explained that Sword began to fumble with his waistband and said something about a gun, so Ketchum returned to the apartment to grab a hammer.

A neighbor who watched part of the incident from her doorway never heard Ketchum physically threaten Sword while they were near the motorcycle. She heard Ketchum and Miller say that they were going to call the police but did not hear Sword say the same.

Miller testified that when she told Sword she was going to call police, he threatened to shoot her, so she began recording him on her phone through her bedroom window. She did not see any gun when Sword made the threat. Sword then began walking around the side of Miller and Ketchum's apartment in the direction of their front door.

The trial court admitted cell phone videos taken by Miller and the neighbor. The videos showed Sword walking away from the motorcycle and around the side of the apartment while Miller filmed him. In one of the videos, Miller yelled at Sword for threatening her with a gun, while Ketchum asked where his hammer was in the background audio.

Ketchum testified that Sword followed him away from the motorcycle and was standing near the front door when Ketchum returned outside with the hammer. When Sword saw the hammer, he pulled out a gun and pointed it at Ketchum. Miller testified that she followed Ketchum outside because he had "a very assertive voice" and Miller believed that if she "let [Ketchum] handle" the situation then "it would have escalated even further." *Id*. at 406. "[M]y brother has a very dominant, assertive voice, his voice can come across very aggressive, and I didn't want just his tone of voice or actions to escalate the situation." *Id*. at 407. Miller stated that Ketchum opened the front door to Sword "standing there with his gun pointed at us." *Id*. at 396. The neighbor also reported that she saw Sword pull out a gun when he neared the front door, at which point the neighbor stopped filming to retreat indoors.

Miller, who was unfamiliar with firearms, did not know the brand of the gun or what color it was but testified that it was a handgun, not a rifle, and was a pistol instead of a revolver. Ketchum testified that the gun was a silver 9-millimeter handgun and was a pistol instead of a revolver. The neighbor also recalled a silver handgun.

When she saw the gun, Miller shoved Ketchum back inside the house and yelled at Sword to leave. She testified, "I told [Sword] that if he didn't leave and I got my hands on his gun I was going to shoot him." *Id*. at 398. Sword began backing away while still pointing the gun at Miller. The siblings agreed that Sword did not ever venture past a line of flower pots that marked the beginning of their property and that he remained in a common area of the apartment complex. After Sword was out of sight, Miller and Ketchum contacted police.

2.    Arrest

Law enforcement arrested Sword at an apartment complex a few hundred yards away approximately 20 minutes after the incident. Police then escorted Miller and Ketchum to the scene of the arrest, where they both identified Sword as the man with the gun. Each of them said that Sword was wearing the same clothes that he had on during the incident outside their apartment.

One police officer testified that he found a silver pistol while frisking Sword during the arrest. Several other officers testified that they watched the gun being removed from Sword's person. The gun was unloaded, had no ammunition, and had debris in the barrel, but it was operational once cleaned.

The trial court admitted redacted versions of two of Sword's prior judgment and sentences, which showed that he had previously been convicted of two counts of second degree assault and one count of residential burglary. The jury did not learn anything about the context of the convictions, only that Sword had three prior convictions for those offenses.

Sword did not testify at trial.

B.    Jury Instructions and Closing Arguments

The trial court provided the jury with an instruction explaining the beyond a reasonable doubt standard. The instruction referenced the concept of abiding belief:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 95.

7

The trial court also instructed the jury that it could consider Sword's prior convictions for second degree assault and residential burglary "only for the purpose of determining whether the defendant had previously been convicted of a serious offense." CP at 106. And the instructions stated that second degree assault and residential burglary were serious offenses.

Next, the jury received several instructions about self-defense. First was a general instruction explaining that the use of reasonable force is lawful if someone believes that they are about to be injured. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02 (5th ed. 2021) (WPIC). The jury instructions also explained that "[a]ctual danger is not necessary for the use of force to be lawful" as long as the defendant "believes in good faith and on reasonable grounds that he is in actual danger of injury," even if they are later shown to be "mistaken as to the extent of the danger." CP at 116; *see* WPIC 17.04. Further, "[i]t is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force." CP at 117; *see* WPIC 17.05. And the jury instructions cautioned that "the law does not impose a duty to retreat" in such circumstances. *Id*.

The State addressed its burden of proof during closing argument:

[PROSECUTOR]: An abiding belief in the truth of the charge . . . is how we talk in the law.

So[,] what does that mean? Abiding, long lasting. Right? Enduring. So it means when you come out of here at the end of all of this, you've evaluated the evidence, do you have an abiding, an enduring belief in the truth of the charge that the defendant has done the things that the State has charged him with, that the witnesses have testified about, that the exhibits demonstrate, do you believe that today, do you believe that tomorrow, do you believe that a year from now. And it is not uncommon, I would say, sometimes to hear a juror say, well, I really believe that she did this thing she was charged with, but I just felt like I didn't get enough proof. I submit to you if that is the statement being made, then that juror's holding the State to a standard they have not been instructed upon.

> [DEFENSE COUNSEL]: Your Honor, I'm going to [make an] objection.
>
> . . . .
>
> [DEFENSE COUNSEL]: The burden of proof is beyond a reasonable doubt, not abiding belief.
>
> THE COURT: Objection noted. The jury has been instructed that they are to follow the instructions that they received from the Court and anything that [the prosecutor] says that's not supported they will disregard. [Prosecutor], you may continue.
>
> [PROSECUTOR]: Thank you.
> As I was saying, reasonable doubt is defined for you right here and that includes the abiding belief instruction. So[,] when you come out of here and you are having -- if you have that conversation, what I submit to you is that you have held the State to a standard beyond what I am required to prove to you. Certainly[,] do not hold me to less than that standard. My standard is beyond a reasonable doubt. But do not hold me to more either. This is your instruction.
> You came in here, you didn't know anything about the case, you were a blank slate, zero information. So[,] I submit to you when you are walking out of this courtroom, if you believe that the defendant, in fact, did the things that he has been charged with, you believe that because of the information that you received in this courtroom and that is the only reason that you believe he did those things because prior to that you did not have that information. So[,] when you're talking about has the State proved this beyond a reasonable doubt, I direct you back to this instruction and ask you to hold me to the standard I am required to prove to you but not more or higher than that standard.

VRP (Mar. 7, 2022) at 911-13.

The State also contended that Ketchum grabbed the hammer "directly in response to the defendant's behaviors" and that Sword's actions put "[Ketchum] in self-defense mode in defense of others," which was "completely reasonable." *Id*. at 925. Similarly, the State argued that Miller's "words alone [were] insufficient to indicate that the defendant was reasonable in holding either her or [Ketchum] at gunpoint." *Id*. at 929. "They acted in self-defense to the defendant on their own property." *Id*. at 930.

9

The State also briefly discussed Sword's prior convictions. The State directed the jury's attention to Sword's name and date of birth on each judgment and sentence, the type of conviction, the date of the offense, and Sword's signature and fingerprints.

During Sword's closing argument, counsel emphasized the evidence that supported Sword's claim of self-defense. Counsel argued that when Ketchum went inside to retrieve his hammer, Sword was walking away from the altercation. Counsel contended that Ketchum's reappearance with the hammer startled Sword and made him fear injury, prompting him to pull out the gun. In particular, Sword argued that it was reasonable to fear a man such as Ketchum "com[ing] at you with a hammer, screaming and yelling at you, his sister in tow, [when] they are advancing on you." *Id.* at 965. Counsel emphasized that Sword had no duty to retreat from the common area of the apartment complex. Counsel also reasoned that Sword kept the gun only as a tool to ward off danger and did not intend to harm Miller or Ketchum, because there was no ammunition in the weapon and the barrel was clogged with debris.

C.    Verdict and Sentencing

The jury convicted Sword on all counts and found that he was armed with a firearm during the assaults.

At sentencing, the trial court imposed concurrent sentences at or near the low end of the standard range for each count. The longest sentence was 87 months for unlawful possession of a firearm. The trial court also imposed 72 months of mandatory consecutive firearm sentencing enhancements, for a total sentence of 159 months of confinement. The judgment and sentence contained a scrivener's error erroneously stating that Sword had been convicted of second degree assault under RCW 9.94A.833(3), which addresses gang-related felonies involving minors.

The trial court found that Sword was indigent under RCW 10.101.010(3)(a)-(c) but nevertheless imposed a criminal filing fee and community custody supervision fees. The trial court also imposed a crime victim penalty assessment.

Sword appeals his convictions and sentence.

ANALYSIS

I. JUROR BIAS

A.     Trial Court

Several police officers testified about the search for Sword, his arrest, and the retrieval of the firearm from his person. Sword argues that the trial court violated his right to a trial by an impartial jury by placing juror 1 on the jury after she stated that she thought police officers were more likely to tell the truth than other people. He reasons that juror 1 "made an unequivocal statement of bias." Br. of Appellant at 18. Thus, he asserts that the trial court had an independent obligation to question or remove juror 1 regardless of whether defense counsel sought to further question or challenge the juror. He insists absent rehabilitation, or at least equivocation about her bias, juror 1 could not properly be placed on the jury. Because juror 1 was never questioned further to establish whether she could remain impartial, Sword insists that we must remand for a new trial. We disagree.

1.     Cases discussing juror bias

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee defendants "the right to a fair and impartial jury." *State v. Brett*, 126 Wn.2d 136, 157, 892 P.2d 29 (1995). RCW 2.36.110 provides that judges have a duty to excuse "any juror, who in the opinion of the judge, has manifested unfitness as a juror" for a list

of reasons including bias and prejudice. *See* CrR 6.4(c)(1) (explaining that a judge should excuse a juror if "grounds for challenge are present," and that if the juror is not excused, then "any party may challenge the juror for cause").

We review a trial court's decision to not dismiss a juror for cause for manifest abuse of discretion. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 856, 456 P.3d 869 (2020). "A trial court abuses its discretion when it bases its decision on untenable grounds or reasons," and the court's "'broad discretion in the conduct of voir dire is nevertheless subject to essential demands of fairness.'" *Id.* (internal quotation marks omitted) (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)).

Trial courts should be cautious about intervening in jury selection. "Whether to keep a prospective juror on the jury panel or whether to dismiss a juror often is based on the trial counsel's experience, intuition, strategy, and discretion." *State v. Lawler*, 194 Wn. App. 275, 285, 374 P.3d 278 (2016). Because "[t]rial counsel may have legitimate, tactical reasons not to challenge a juror who may have given responses that suggest some bias," a "trial court that sua sponte excuses a juror runs the risk of disrupting trial counsel's jury selection strategy." *Id*. And trial courts are in a much better position to evaluate prospective jurors than this court because they can observe jurors' "tone of voice, facial expressions, body language, or other forms of nonverbal communication," while we must rely on transcribed answers. *Id*. at 287. But "[t]he trial court must excuse a juror for cause if actual bias is shown." *State v. Grenning*, 142 Wn. App. 518, 540, 174 P.3d 706 (2008).

"Actual bias" is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party." RCW 4.44.170(2). If a

12

juror has demonstrated actual bias "'without a subsequent assurance of impartiality,' a court should 'always' presume juror bias." *Guevara Diaz*, 11 Wn. App. 2d at 855 (internal quotation marks omitted) (quoting *Miller v. Webb*, 385 F.3d 666, 674 (6th Cir. 2004)).

"A defendant must prove actual bias." *Grenning*, 142 Wn. App. at 540. This means that they "must show 'more than a mere possibility that the juror was prejudiced.'" *Id.* (internal quotation marks omitted) (quoting *State v. Noltie*, 116 Wn.2d 831, 840, 809 P.2d 190 (1991)). "The trial judge is in the best position upon observation of the juror's demeanor to evaluate the responses and determine if the juror would be impartial." *Brett*, 126 Wn.2d at 158. For example, Division One held that a juror expressed actual bias when she answered that she would like to say the defendant was guilty and she was not questioned further. *State v. Irby*, 187 Wn. App. 183, 196, 347 P.3d 1103 (2015). Likewise, Division One determined that a juror's answer in a questionnaire that she could not be fair to both sides in a trial for sexual assault showed actual bias when the defendant was charged with second degree rape and neither the trial court nor defense counsel individually questioned the juror about her answer. *Guevara Diaz*, 11 Wn. App. 2d at 846.

In contrast, a showing of only the *possibility* of prejudice will not constitute actual bias. *Grenning*, 142 Wn. App. at 540. Significantly, "[a] prospective juror's expression of preference in favor of police testimony does not, standing alone, conclusively demonstrate bias." *State v. Gonzales*, 111 Wn. App. 276, 281, 45 P.3d 205 (2002), *overruled on other grounds by State v. Talbott*, 200 Wn.2d 731, 521 P.3d 948 (2022). "However, if this stated preference rises to a preconceived opinion or belief about the issues, then actual bias is established." *State v. Griepsma*, 17 Wn. App. 2d 606, 614, 490 P.3d 239 (2021). The juror in *Gonzales* "not only admitted that she would have a 'very difficult' time disbelieving a police officer, she admitted she was not sure she

could afford Gonzales the presumption of innocence if an officer testified." 111 Wn. App. at 282. Division One held that the trial court abused its discretion by rejecting Gonzales' challenge for cause. *Id*. In contrast, this court held that a trial court did not abuse its discretion by denying a challenge for cause against a former police officer whose answers to certain questions suggested "a preference in favor of a police officer's testimony" when that juror also asserted "that he had an open mind as to the issue of guilt." *State v. Gosser*, 33 Wn. App. 428, 434, 656 P.2d 514 (1982).

2.     Juror 1 did not express actual bias

Sword insists that the trial court had an obligation to question juror 1 further to see if she could remain fair and impartial regarding the issues presented at trial despite her expressed preference for law enforcement testimony. But juror 1 did not identify as working in law enforcement or having family who worked in law enforcement. She did not answer any questions seeking to identify strong feelings about crime in general, people charged with assault, or people sharing key characteristics of the defendant—people with face or neck tattoos, homeless people, or people who have been convicted of serious offenses. Unlike the jurors in *Irby*, *Guevara Diaz*, and *Gonzales*, she never stated or implied that she would have trouble judging Sword fairly, nor did she opine on any ultimate issue before the jury. She did not say that law enforcement officers always testify truthfully. She stated only that she believed that police officers were more likely to tell the truth than other witnesses. In the context of her other answers, this did not rise to "a preconceived opinion or belief about the issues" in the case and was not enough to constitute actual bias, despite the lack of individual questioning. *Griepsma*, 17 Wn. App. 2d at 614. *See Noltie*, 116 Wn.2d at 838; *Grenning*, 142 Wn. App. at 540.

Significantly, the law enforcement testimony in this case primarily addressed the search for Sword based on the description provided by Miller and Ketchum, and the removal of a firearm from Sword's person during his arrest. Sword does not raise any assignment of error related to the procedures used by the police in this case. To the extent that identity was an issue at trial, the jury's determination of that issue turned on their assessment of testimony from Miller and Ketchum, not law enforcement officers. And although the recovery of the firearm was relevant to the unlawful possession of a firearm charge, Miller, Ketchum, and their neighbor all testified that they saw Sword with a gun that matched the description of the one police recovered. Thus, the law enforcement testimony in this case was duplicative and not contested. A feeling that law enforcement officers were more likely to testify truthfully than other people would not have resulted in actual bias in this case.

The trial court did not err when it did not second guess defense counsel's jury selection strategy and sua sponte intervene to question or remove a witness who expressed a preference for police testimony but had no other strong opinions relevant to issues or parties in the case.

B.     <u>Defense Counsel</u>

In the alternative, Sword argues that trial counsel rendered ineffective assistance by failing to further question juror 1, "move to excuse her for cause, or use a peremptory challenge to remove her from the jury." Br. of Appellant at 22. He relies on the assertion that juror 1 expressed actual bias to conclude that counsel performed deficiently by failing to investigate further. Sword further contends that "the presence of a biased juror cannot be considered harmless and requires a new trial without a showing of prejudice." *Id*. at 25. We disagree.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). A defendant claiming ineffective assistance must show both that counsel performed deficiently and that counsel's performance prejudiced the defendant. *Id*. at 32-33. The failure to demonstrate either prong of the test will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

We strongly presume that counsel's performance was not deficient. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). And we will not find ineffective assistance if "the actions of counsel complained of go to the theory of the case or to trial tactics" unless there is no conceivable legitimate tactic to explain counsel's decision. *State v. Renfro*, 96 Wn.2d 902, 909, 639 P.2d 737 (1982); *Grier*, 171 Wn.2d at 33. To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862.

"Jury selection involves strategic and tactical decisions for defense counsel." *Lawler*, 194 Wn. App. at 290. Trial counsel may think a prospective juror would be "a good juror despite [their] voir dire responses because of [their] background, other personal characteristics, mannerisms, or nonverbal communication." *Id*. Or defense counsel may prefer one prospective juror over the person who would be seated in their place if that prospective juror was excused. *Id*. In sum, trial counsel may have legitimate tactical reasons for not challenging a juror who gives "responses that suggest some bias" but does not demonstrate actual bias. *Id*. at 285.

Here, several other prospective jurors also thought that police were more likely to tell the truth than other witnesses. Each of those other prospective jurors then admitted to having close

friends or family in law enforcement, and trial counsel exercised peremptory challenges against those jurors. Counsel also challenged for cause other jurors that counsel argued had favorable biases towards police witnesses, with partial success. Juror 1 did not articulate any actual bias or make any statements implying that she held biases against people who were homeless, had face and neck tattoos, were charged with a crime, or had prior convictions for serious offenses. And the case primarily turned on the jury's assessment of Miller and Ketchum's credibility. Police testimony was limited, addressing primarily uncontested facts: the search for the person Ketchum and Miller confronted, Sword's arrest, and the presence of a firearm on his person.

Given the more explicit biases articulated by other prospective jurors and the limited role of law enforcement testimony in the case, there were legitimate tactical reasons for trial counsel not to further question juror 1, challenge her for cause, or exercise a peremptory challenge against her even though her response "sugget[ed] some bias." *Lawler*, 194 Wn. App. at 285. As discussed above, Sword has not proved actual bias. And we defer to counsel's assessment of factors that this court cannot review from a trial transcript, like body language and demeanor. *Id*. at 290. Because essentially all police testimony in this case was duplicative of that provided by other witnesses, Sword does not show a reasonable probability that the outcome of his trial would have been different but for the seating of juror 1. Thus, he also cannot show prejudice.

We hold that Sword was not deprived of effective assistance of counsel stemming from his attorney's decision not to challenge the seating of juror 1.

## II. EVIDENCE OF PRIOR SERIOUS OFFENSE CONVICTIONS

First degree unlawful possession of a firearm requires proof of a prior serious offense. Former RCW 9.41.040(1)(a). Sword next argues that the trial court abused its discretion by

admitting evidence that Sword had been convicted of three prior serious offenses. The prior convictions were admitted as evidence of the unlawful possession of a firearm charge because Sword refused to stipulate that he had been convicted of a serious offense. Sword asserts that admitting three prior convictions, instead of only one, was "unduly prejudicial and unnecessarily cumulative evidence" that violated ER 403. Br. of Appellant at 26. We disagree.

We review a trial court's evidentiary ruling for abuse of discretion. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). An abuse of discretion occurs when the trial court bases its decision on untenable grounds or reasons. *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). Where reasonable people "could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion." *Demery*, 144 Wn.2d at 758.

ER 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

A person commits first degree unlawful possession of a firearm if they possess a firearm after being convicted of a serious offense. Former RCW 9.41.040(1)(a). If a defendant offers to stipulate to their prior serious offenses as an element of unlawful possession of a firearm, the State must accept the stipulation. *Old Chief v. United States*, 519 U.S. 172, 191, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997); *State v. Johnson*, 90 Wn. App. 54, 63, 950 P.2d 981 (1998). But if a defendant does not offer to stipulate to the fact of their prior conviction, the State may offer evidence that is probative to prove that the defendant was convicted of a serious offense. *State v. Gladden*, 116 Wn. App. 561, 566, 66 P.3d 1095 (2003).

18

Sword relies on *State v. Young*, where the defendant made an *Old Chief* stipulation but the trial court then accidentally disclosed to the jury venire that the conviction was for second degree assault. 129 Wn. App. 468, 472, 119 P.3d 870 (2005). The trial court did not "instruct the jury that it could not consider the prior act for any purpose other than determining Young's guilt on the [unlawful possession of a firearm] charge." *Id*. at 476. "Thus, even if one assumes that any instruction could have cured this trial irregularity, the jury was never told to disregard the disclosure." *Id*.

*Young* is distinguishable. Here, Sword declined to stipulate to his prior convictions under *Old Chief*. The trial court admitted two prior judgment and sentences containing three convictions: one for two counts of second degree assault, and one for a single count of residential burglary. The trial court also gave a limiting instruction directing the jury to consider those prior convictions only for the purpose of determining whether Sword had previously been convicted of a serious offense.

A defendant may not dictate how the State proves its case as long as the State operates within the bounds of the state and federal constitution, applicable statutes, and rules of evidence. The State did not belabor Sword's prior convictions or provide unnecessary details, arguing in closing only that the convictions existed. And the jury could have found issue with the proof of one of Sword's prior judgment and sentences. Once a defendant has declined to make an *Old Chief* stipulation after being charged with unlawful possession of a firearm, the State is entitled to prove that the defendant has been convicted of a serious offense. And Sword cites no authority holding that the State is limited to proof of a single prior serious offense in the absence of an *Old Chief* stipulation.

We hold that the trial court did not abuse its discretion by admitting evidence that Sword had multiple prior serious offense convictions.

### III. REVIVED SELF DEFENSE INSTRUCTION

Sword also asserts that trial counsel rendered ineffective assistance by failing to seek a jury instruction on revived self-defense. He reasons that the evidence supported the instruction and trial counsel argued the theory in closing. But "counsel failed to request an instruction to guide the jury's evaluation of that theory," which Sword contends was deficient performance. Br. of Appellant at 44. And Sword insists that the lack of that instruction "effectively prevented the jury from finding" that Sword acted in self-defense, constituting prejudice. *Id*. at 47. We disagree.

Where the ineffective assistance claim is based on counsel's failure to request a jury instruction, the defendant must show they were "entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." *Classen*, 4 Wn. App. 2d at 540. "'Jury instructions are sufficient if they permit each party to argue his theory of the case and properly inform the jury of the applicable law.'" *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999) (quoting *State v. Bowerman*, 115 Wn.2d 794, 809, 802 P.2d 116 (1990)).

The Washington Supreme Court has provided that someone who was the first aggressor or provoked an altercation cannot assert self-defense "unless he in good faith had first withdrawn from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action." *State v. Craig*, 82 Wn.2d 777, 783, 514 P.2d 151 (1973). "If there is credible evidence that the defendant made

the first move by drawing a weapon, the evidence supports the giving of an aggressor instruction." *Riley*, 137 Wn.2d at 910.

To be entitled to a revived self-defense instruction, the defendant must show clear intent to withdraw from the confrontation. The Supreme Court has held that demonstrating intent to withdraw from a confrontation involving a gun requires dropping the gun or surrendering. *State v. Dennison*, 115 Wn.2d 609, 618, 801 P.2d 193 (1990). In *Dennison*, "[b]ecause Dennison still had his gun, although pointed to the ground, this action did not clearly manifest a good faith intention to withdraw from the burglary or remove the decedent's fear." *Id*. Thus, the trial court properly refused to issue Dennison's proposed revived self-defense instruction.

In contrast, Division One recently held that a defense attorney rendered ineffective assistance by failing to request a revived self-defense instruction. *State v. Fleeks*, 25 Wn. App. 2d 341, 356, 523 P.3d 220, *review denied,* 1 Wn.3d 1014, 530 P.3d 185 (2023). In that case, after Fleeks initially attacked his victim, surveillance video showed that he walked away while the victim followed him. *Id*. at 355-56. The victim cornered Fleeks against a wall while making throat-slashing gestures and eventually punched him, after which Fleeks shot the victim. *Id*. at 356. The jury in *Fleeks* received a first aggressor instruction, which provided that "[n]o person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person." *Id*. at 353 (citing 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04 (5th ed. 2021)). Thus, if the jury found that Fleeks "was the aggressor, and that [his] acts and conduct provoked or commenced the fight, then self-defense [was] not available as a defense." *Id*. at 353-54 (citing 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04 (5th ed. 2021)). Because

the jury in *Fleeks* did not receive a revived self-defense instruction, Division One held that "Fleeks could not argue his defense based on either self-defense or revived self-defense theories." *Id*. at 356. "Thus, counsel was deficient in not putting forth a revived self-defense instruction with no tactical reason for doing so." *Id*.

Here, both parties argued theories of the case based on self-defense, without the aid of a first aggressor or a revived self-defense instruction. The State asserted that Sword's aggression triggered Ketchum's actions with the hammer and Miller's threat to shoot Sword if she gained control of his gun. Defense counsel argued that Sword disengaged and was walking away from the confrontation when Ketchum charged out of the house with the hammer, causing Sword to fear injury and raise the gun in response.

Even assuming the evidence would have supported a revived self-defense instruction, there were tactical reasons for counsel to avoid seeking the instruction. Unlike *Fleeks*, there was no first aggressor instruction given in this case. But the jury received numerous other instructions about the nuances of self-defense that allowed both sides to adequately argue their theory of the case. Seeking a revived self-defense instruction could have resulted in the State pursuing a first aggressor instruction, which it would likely have been entitled to, and there were tactical reasons to avoid informing the jury of first aggressor concepts given the conflicting testimony on whether Sword pulled his gun before or after he saw Ketchum wielding a hammer. As given, the instructions allowed Sword to argue that he acted in self-defense without the problematic addition of the first aggressor instruction. *Riley*, 137 Wn.2d at 909. Thus, counsel did not perform deficiently by electing not to seek a separate instruction on revived self-defense.

We hold that Sword did not receive ineffective assistance when his attorney did not seek a revived self-defense instruction.

## IV. PROSECUTORIAL MISCONDUCT

During closing argument, the prosecutor attempted to explain the reasonable doubt standard to the jury by stating, "[I]t is not uncommon . . . to hear a juror say, well, I really believe that she did this thing she was charged with, but I just felt like I didn't get enough proof." VRP (Mar. 7, 2022) at 911. "I submit to you if that is the statement being made, then that juror's holding the State to a standard they have not been instructed upon." *Id*. at 911-12.

Sword argues this statement was misconduct because it mischaracterized the State's burden of proof in closing argument. He reasons that the prosecutor improperly asked the jury to "decide the case based on gut feeling rather than evidence." Br. of Appellant at 47-48. He asserts that defense counsel's objection and the trial court's curative instruction were insufficient to remedy the ensuing prejudice. We agree that the prosecutor's argument was improper but we conclude that Sword has failed to show prejudice.

Prosecutorial misconduct can violate a defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). When the defendant objected to the prosecutor's remarks at trial, the defendant must show both that the remarks were improper, and that there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

We evaluate prosecutor's remarks "in the context of the record and all of the circumstances of the trial." *Glassman*, 175 Wn.2d at 704. "Shifting the burden of proof to the defendant is

23

improper argument" that constitutes prosecutorial misconduct. *Id.* at 713. More specifically, "[m]isstating the basis on which a jury can acquit insidiously shifts the requirement that the State prove the defendant's guilt beyond a reasonable doubt" and violates due process. *Id.*

The State points to *State v. Feely*, where Division One held that a prosecutor did not commit misconduct when they "told the jury that '[i]t can be very frustrating to have a jury come back and say we all knew he was guilty, but you didn't prove it beyond a reasonable doubt. Those are inconsistent.'" 192 Wn. App. 751, 763, 368 P.3d 514 (2016) (alteration in original). The State's reliance on *Feely* is unhelpful on the issue of whether misconduct occurred because in that case, Division One did not address whether the comment was improper. Rather, because Feely did not object to the comment, Division One concluded that the prosecutorial misconduct claim was waived because any prejudice that may have ensued from the prosecutor's argument could have been neutralized by a curative instruction. *Id.* at 763-64.

Here, the prosecutor argued that the jury would hold "the State to a standard they have not been instructed upon" if they believed that Sword "did this thing [he] was charged with," but "felt like [they] didn't get enough proof" to convict him. VRP (Mar. 7, 2022) at 911-12. Sword objected and the trial court directed the jury "to follow the instructions that they received from the Court" and to disregard "anything that [the prosecutor] says that's not supported" by those instructions. *Id.* at 912. The prosecutor then returned its improper argument despite the court's ruling, stating that "if you have *that conversation*, what I submit to you is that you have held the State to a standard beyond what I am required to prove to you." *Id.* (emphasis added). She continued, "if you believe that the defendant, in fact, did the things that he has been charged with, you believe that

because of the information that you received in this courtroom," that would constitute belief beyond a reasonable doubt. *Id*. at 913.

The prosecutor's statements were improper because they clearly implied that the jury had a duty to convict Sword even if the jurors did not feel that they had been presented with proof beyond a reasonable doubt. *Glassman*, 175 Wn.2d at 713. If the State has not met its burden of proof, a jury should not convict a defendant based solely on their belief that the defendant is guilty. Implying otherwise is blatantly improper. In general, adding words to the reasonable doubt instruction or trying to explain the standard to the jury using language other than that in the instruction itself risks shifting the burden of proof to the defendant. This practice should be avoided.

Here, although the remarks of the prosecutor were improper, they nevertheless fall short of the trivialization of the burden of proof that requires reversal. The trial court intervened to refer the jury back to their instructions and told the jury to disregard any argument that was inconsistent with the instruction. The prosecutor also then referred back to the reasonable doubt instruction, asking the jury to hold the State to the standard it was "required to prove to you but not more or higher than that standard." VRP (Mar. 7, 2022) at 913. This was sufficient correction to remedy any prejudice from the improper statement. Therefore, Sword cannot show a substantial likelihood that the misconduct affected the jury's verdict. *Emery*, 174 Wn.2d at 760. Thus, we decline to reverse Sword's convictions on this basis.

Finally, Sword argues that an accumulation of errors prejudiced him and require a new trial under the cumulative error doctrine. Here, the prosecutor's misstatement in closing was the only error, so the cumulative error doctrine is inapplicable.

25

V. JUDGMENT AND SENTENCE ISSUES

A.      Whether the Trial Court Imposed an Exceptional Sentence

Sword asserts that the trial court imposed an exceptional sentence based on the "free crimes" aggravator in RCW 9.94A.535(2)(c) but failed to attach written findings of fact and conclusions of law to the judgment and sentence. The trial court imposed concurrent sentences at or near the bottom of the standard sentencing range for each charge, and imposed consecutive firearm sentencing enhancements for a total sentence of 159 months. "[A]ll firearm enhancements . . . are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements." RCW 9.94A.533(3)(e). Because firearm sentencing enhancements increase the length of the standard sentencing range, this was not an exceptional sentence.

B.      Legal Financial Obligations and Scrivener's Error

Sword argues, and the State concedes, that we should remand for the trial court to strike the criminal filing fee, community custody supervision fees, and crime victim penalty assessment from Sword's judgment and sentence. Sword also asserts, and the State concedes, that we should remand to correct a scrivener's error in the judgment and sentence.

Trial courts may no longer impose the criminal filing fee, community custody supervision fees, or crime victim penalty assessment on indigent defendants. LAWS OF 2022, ch. 29, §§ 7, 8; LAWS OF 2023, ch. 449, §§ 1, 4; *see* RCW 7.68.035(4)-(5); *see* RCW 9.94A.703; *see* RCW 43.43.7541(2). A new statute applies to all cases that were pending on direct appeal when the statute took effect. *State v. Jefferson*, 192 Wn.2d 225, 246, 429 P.3d 467 (2018). The trial court

26

found Sword indigent under RCW 10.101.010(3)(a)-(c) at sentencing, so those legal financial obligations should no longer be imposed.

Additionally, the judgment and sentence states that Sword was convicted of second degree assault while armed with a firearm under several statutes including RCW 9.94A.833(3). That statute addresses gang-related felonies involving minors and does not have a subsection (3). The State acknowledges that this "was clearly a typographical error" and concedes that we should remand to correct the citation to RCW 9.94A.533(3), which addresses firearm sentencing enhancements. Br. of Resp't at 55. We accept the State's concessions and remand for correction of this scrivener's error.

## CONCLUSION

We remand for the trial court to strike the criminal filing fee, community custody supervision fees, and crime victim penalty assessment from Sword's judgment and sentence. On remand, the trial court must also correct the scrivener's error in Sword's judgment and sentence. We otherwise affirm.

No. 57320-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Cruser, J.